**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| STEPHEN GILBERT, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-3986 |
| | § | |
| STEVEN FRENCH, *et al.*, | § | |
| Defendants. | § | |

## <u>MEMORANDUM AND ORDER</u>

State inmate Stephen Gilbert (TDCJ # 1378106) has filed a complaint under 42

U.S.C. § 1983, alleging violations of his civil rights.   Gilbert proceeds *pro se* and has

received permission to proceed *in forma pauperis*.   Gilbert complains that officers

with the City of Bryan Police Department used excessive force against him during the

course of his arrest on December 19, 2004, and alleges further that other officers

failed to intervene on his behalf or delayed his access to medical treatment.   He seeks

$50,000,000 in damages.[1]   At the Court's request, Gilbert has provided a more definite

---

[1]   Gilbert seeks "actual damages, punitive damages, compensatory damages, exemplary [sic] damages, and nominal damages."   However, "no punitive damages are allowed [against a municipality] unless expressly authorized by statute," *Newport v. Fact Concerts*, 453 U.S. 247, 261 n.21 (1981), and Texas law does not permit such damages.   *See* TEX. CIV. PRAC. & REM. CODE § 101.024; *see also City of LaPorte v. Barfield*, 898 S.W.2d 288, 299 (Tex. 1995).   In addition, punitive damages are not recoverable under 42 U.S.C. § 1981 against municipalities, *see Newport*, 453 U.S. at 271, or government employees acting in their official capacity, *see Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir. 1996) (noting that official-capacity claims are treated as claims against the municipality).   Thus, to the extent Gilbert seeks punitive damages from the City or from City employees sued in their official capacity,
(continued...)

statement of his claims [Doc. # 13].  After reviewing all of the pleadings as required by 28 U.S.C. § 1915A, the Court authorized service and requested an answer from the City of Bryan and the police officers.[2]  These defendants complied [Doc. # 41] and subsequently filed a Motion for Summary Judgment [Doc. # 58],[3] arguing that they are immune from suit.[4]  Gilbert has responded [Doc. # 65].  Upon review of the

---

[1]      (...continued)
         such claims are without legal merit and are **dismissed**.

[2]      These officers include:  Steven French, Demond Oliver, Travis Hines, Matthew Harrison, Al Hauke, Candido Amayo, Dean Schwartzlander, Andrea Schooler, Dennis Haynes, Steven Spillars, Ryan Bona, Stacy Pottinger Nunn, John Sennett, Kyle Halbert, Lori Anderson Berndt, and Steven Fry.

         Chief of Police Bobby Whitmire, although not named as a defendant by Gilbert, was also served.  Gilbert raises failure to train and supervise claims against Assistant Chief of Police Peter Scheets.  However, Scheets does not appear to be an official policymaker for the City and thus, is not the proper defendant for this claim.  In order to avoid collateral litigation, and in the interests of justice, the Court served Chief Whitmire as the official policymaker for the City of Bryan Police Department and the proper defendant for a failure to train and/or supervise claim.  Assistant Chief Scheets is **dismissed** from this suit.

         Gilbert also named Brazos County Sheriff Christopher Kirk as a defendant.  For the reasons discussed in Section III.C, *infra*, the Court did not authorize service on Sheriff Kirk, who is hereby **dismissed** from this suit.

         Finally, Gilbert complains that St. Joseph Hospital and four hospital employees, acting as agents of the police, denied him medical treatment.  As discussed in Section III.D, *infra*, the case against some of these defendants remains pending.  The nurses named by Gilbert, Tracy Shimek (misspelled by Gilbert as "Shimmick") and "Jane Doe," are **dismissed**.

[3]      In response to a request by the Court to better identify various documents submitted as exhibits to their motion, *see* Order of Jan. 24, 2008 [Doc. # 67], Defendants have also filed a Supplement to their Motion for Summary Judgment [Doc. # 68].

[4]      Defendant's motion is alternatively a motion to dismiss.  However, because Defendants request that the Court consider matters outside the pleadings in deciding the motion, the
                                                                                    (continued...)

parties' submissions, all pertinent matters of record, and applicable law, the Court concludes that Defendants' Motion for Summary Judgment should be **granted in part** and **denied in part**.

## I.   FACTUAL BACKGROUND

Plaintiff Stephen Gilbert is currently in the custody of the Texas Department of Criminal Justice – Correctional Institutions Division ("TDCJ") serving two concurrent thirty-year prison sentences for aggravated robbery with a deadly weapon.

On December 19, 2004, at approximately 9:30 p.m., Gilbert and another man, Michael Hall, entered a Taqueria Arandas restaurant in Bryan, Texas.  According to witnesses, Gilbert and Hall were both wearing masks over their faces; Gilbert was armed with a piece of pipe and Hall was carrying a gun.[5] Upon entering the restaurant, Gilbert and Hall assaulted and restrained four of the five employees in the building.[6] The fifth employee was able to exit the restaurant and contact police.[7] However, it was not clear from her call how many men were robbing the restaurant or how many

---

[4]    (...continued)
Court analyzes the motion as a motion for summary judgment.  *See* FED. R. CIV. P. 12(d); *see also* Order for Service of Process [Doc. # 14], ¶ 6.

[5]    *See* Defendant's Motion for Summary Judgment ("MSJ") [Doc. # 58], Ex. B-5: "Supplemental Report – A. Martinez," at 2.

[6]    *See id.*, at 2–3; *see also* MSJ [Doc. # 58], Ex. B-8:  "Transcript of Interview of Gilbert by Officers Fry and Anderson," at 410–11.

[7]    *See* MSJ [Doc. # 58], Ex. B-5:  "Supplemental Report – A. Martinez," at 2.

employees remained trapped inside.[8]  While police were en route, Gilbert and Hall demanded money from and robbed the Spanish-speaking employees at gunpoint.[9]

Numerous police units quickly arrived on the scene and began surrounding the restaurant.  While positioning themselves, police learned that a dispatcher heard, over an open telephone line to the restaurant, a male stating, "If he does not get any money, somebody is going to die."[10]  During this time, an officer also observed through a restaurant window a masked man armed with a gun.[11]

Soon thereafter, Hall, still masked, opened and looked out of the back door of the restaurant.  Police announced themselves and ordered Hall to surrender.  He refused and went back into the restaurant.[12]  A few minutes later, the door opened again and three men—Gilbert, Hall, and a hostage—exited.  The hostage was covered in blood and was being used by Gilbert and Hall as a shield between them and the

---

[8]    *See* MSJ [Doc. # 58], Ex. B-2:  "Transcript of 911 Call"; *see also* MSJ [Doc. # 58], Ex. B-3: "BPD Supplemental Case Report," at 1; Ex. B-5:  "Supplemental Report – A. Martinez," at 2; Ex. B-11:  "Report of Officer S. Fry," at 2; Ex. B-17:  "Report of Officer S. Pottinger," at 2; Ex. B-19:  "Transcript of Interview of Officer D. Schwartzlander," at 4–5.

[9]    *See* MSJ [Doc. # 58], Ex. B-5:  "Supplemental Report – A. Martinez," at 3–4.

[10]   *See* MSJ [Doc. # 58], at 4; Ex. B-1:  "Resident Incident Activity Summary," at 1; Ex. B-2: "Transcript of 911 Call," at 4–5; Ex. B-3:  "BPD Supplemental Case Report," at 4; *see also* MSJ [Doc. # 58], Ex. B-11:  "Report of Officer S. French," at 1.

[11]   *See* MSJ [Doc. # 58], Ex. B-19:  "Report of Officer D. Swartzlander," at 1.

[12]   *See* MSJ [Doc. # 58], Ex. B-11:  "Report of Officer S. French," at 1.

police.[13]  Police immediately demanded that Gilbert and Hall show their hands and get

down on the ground; both refused.[14]  Hall then shoved the hostage towards police,

revealing a large black handgun pointed at the officers.[15] Gilbert and Hall immediately

began to run in opposite directions, ignoring police commands to stop.[16]  The officers

then began to fire, hitting both Gilbert and Hall.[17]  Hall ultimately died from his

injuries.  Gilbert was shot twice—once in each shoulder[18]—and within minutes was

transported by ambulance to St. Joseph Hospital.[19]

 While at the hospital, Gilbert received medical treatment for his wounds while

---

[13] *See* MSJ [Doc. # 58], Ex. B-10: "Report of Officer R. Bona," at 1–2; Ex. B-14: "Report of Officer J. Hauke,"at 1–2.

[14] *See* MSJ [Doc. # 58], Ex. B-16: "Report of Officer D. Oliver," at 1.

[15] *See* MSJ [Doc. # 58], Ex. B-19: "Report of Officer D. Swartzlander," at 2.

[16] *See* MSJ [Doc. # 58], Ex. B-13: "Report of Officer M. Harrison," at 1–2; Ex. B-15: "Report of Officer T. Hines"; Ex. B-19: "Transcript of Interview of Officer D. Schwartzlander," at 11–12.

[17] *See* MSJ [Doc. # 58], Ex. B-18: "Report of Officer A. Schooler," at 4–5.

[18] Gilbert suffered a broken right arm and injuries to his right shoulder, which required surgery. *See* MSJ [Doc. # 58], Ex. F: "Medical Records of Stephen Gilbert."  He also claims to now suffer nerve damage in both arms and his neck, as well as a variety of psychological ailments.  *See* Plaintiff's More Definite Statement [Doc. # 13], at 14.

[19] *See* MSJ [Doc. # 58], Ex. B-3: "BPD Supplemental Case Report," at 7–10; *see also* MSJ [Doc. # 58], Ex. B-15: "Report of Officer T. Hines," at 2; Ex. B-19: "Report of Officer D. Swartzlander," at 3.

 Gilbert, in his Complaint, claims that he was forced by Hall at gunpoint to commit the robbery and asserts that he did not actively participate in the crime.  However, Gilbert has been found guilty of aggravated robbery by a jury and this is not the proper forum to revisit his conviction.

being questioned by police.[20]   However, Gilbert asked for pain medication several times, but did not receive any until more than two hours after his arrival at the hospital.  At some point, Gilbert was arrested.[21]  He remained in the hospital for three days and was released to police custody.

## II.   **LEGAL STANDARD**

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case for which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).  In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to

---

[20]   Gilbert continually claims that he was denied medical treatment by St. Joseph Hospital. However, as discussed more fully in Section III.A.2.c., *infra*, documents provided by both Gilbert and Defendants establish that medical personnel were attending to Gilbert immediately upon his arrival at the hospital.  *See* MSJ [Doc. # 58], Ex. B-7:  "Transcript of Interview of Gilbert by Officer Anderson" (This document was also provided by Gilbert.); Ex. B-8:  "Transcript of Interview of Gilbert by Officers Fry and Anderson"; Ex. F: "Medical Records of Stephen Gilbert"; Ex. G:  "EMS Records – Transport of Stephen Gilbert to St. Joseph Hospital"; *see also* MSJ [Doc. # 58], Ex. K:  "Affidavit of Officer L. Anderson."

[21]   *See* MSJ [Doc. # 58], Ex. B-19:  "Record of Arrest"; *see also* Supplement [Doc. # 68], Ex. 3: "Statement of Officer L. Anderson."

interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P.  56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The moving party, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).  The moving party may meet its burden by pointing out "'the absence of evidence supporting the non-moving party's case.'" *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir. 1992)).  However, if the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the non-movant's response. *ExxonMobil Corp.*, 289 F.3d at 375.

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001).

"An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the non-moving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  However, factual controversies are resolved in favor of the non-movant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).  The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.  *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002) (noting that unsworn pleadings do not constitute proper summary judgment evidence). Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden.  *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *see also Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994) (Showing "some metaphysical doubt as to the material facts" will not create a genuine dispute.).  Instead, the non-moving party must present specific facts which show "the

existence of a 'genuine' issue concerning every essential component of its case." *Id.*
In the absence of any proof, the court will not assume that the non-movant could or
would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife
Fed'n*, 497 U.S. 871, 888 (1990)).

Finally, pleadings filed by *pro se* plaintiffs are construed by courts under a less
stringent standard than those drafted by attorneys.  *See Haines v. Kerner*, 404 U.S.
519, 520–21 (1972).  Under this standard, pleadings filed by a *pro se* litigant are
entitled to a liberal construction that affords all reasonable inferences which can be
drawn from them.  *See id.*; *Oliver v. Scott*, 276 F.3d 736, 740 (5th Cir. 2000).
Nevertheless, "the notice afforded by the Rules of Civil Procedure and the local rules"
is considered "sufficient" to advise a *pro se* party of his burden in opposing a
summary judgment motion.  *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th
Cir. 1992); *see also Ogbodiegwu v. Wackenhut Corrections Corp.*, 202 F.3d 265 (5th
Cir. 1999) (unpublished table opinion) ("Although the pleadings filed by *pro se*
parties are held to 'less stringent standards than formal pleadings drafted by lawyers,'
*pro se* parties must still comply with the rules of procedure and make arguments
capable of withstanding summary judgment." (citing *Haines*, 404 U.S. at 520; *Grant
v. Cellular*, 59 F.3d 523, 524 (5th Cir. 1995)).

## III.   <u>ANALYSIS</u>

A.      **Claims against Bryan Police Officers**

Gilbert brings suit against sixteen City of Bryan police officers,[22] alleging various civil rights violations cognizable under 42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States[,] and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law."[23]  *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994).   Further, a plaintiff asserting a § 1983 cause of action against a government official in his individual capacity must make specific factual allegations that support the individual defendants' role in the constitutional deprivation at issue.  *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002).

In this case, Gilbert has alleged that certain City of Bryan police officers used excessive force against him, that others failed to intervene on his behalf to prevent the use of excessive force, and that two others delayed his access to medical care to treat his resulting gunshot wounds.  He claims further that these actions were conducted

---

[22]     These officers include:  Steven French, Demond Oliver, Travis Hines, Matthew Harrison, Al Hauke, Candido Amayo, Dean Schwartzlander, Andrea Schooler, Dennis Haynes, Steven Spillars, Ryan Bona, Stacy Pottinger Nunn, John Sennett, Kyle Halbert, Lori Anderson Berndt, and Steven Fry.

[23]     The parties do not contest that the defendant police officers in this case were acting under the color of state law.

pursuant to a Bryan police department policy of racial profiling.

### 1.    Official Capacity Claims

Gilbert asserts that he is pursuing his causes of action for violations of 42 U.S.C. § 1983 against the Bryan police officers in both their official and individual capacities.  A suit against a City official in his official capacity is equivalent to a suit against the City.  *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  Because the City is already a defendant in this case, any claims against the individuals in their official capacities are duplicative, and are dismissed.

### 2.    Individual Capacity Claims

Gilbert also brings suit against the officers in their individual capacities. As to these claims, the officers move for summary judgment on the grounds that they are entitled to qualified immunity from suit.  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  The doctrine shields public officials, acting within the scope of their authority, from civil liability for performing discretionary functions "insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known."  *Flores v. City of Palacios*, 381 F.3d 391, 394 (5th Cir. 2004); *see also Harlow v. Fitzgerald*, 475 U.S. 800 (1982); *Cozzo v.*

*Tangipahoa Parish Council*, 279 F.3d 273, 284 (5th Cir. 2002). "The Supreme Court has characterized the doctrine as protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In assessing qualified immunity, the Court must conduct a bifurcated analysis. *See, e.g.*, *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004). First, the Court must decide whether the plaintiff has alleged a constitutional violation and, if so, whether the violation is of a "clearly established" constitutional right. *Id.*; *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). A right is "clearly established" for purposes of qualified immunity if "[t]he contours of the right [are] sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). If the Court finds a violation of a clearly established right, the defendant is nonetheless entitled to immunity if "[his] conduct was objectively reasonable" in light of "law which was clearly established at the time of the disputed action." *Collins*, 382 F.3d at 537; *see also Goodson v. City of Corpus Christi*, 202 F. 3d 730, 736 (5th Cir. 2000).

Importantly, even on summary judgment, once a defendant, in good faith, invokes entitlement to qualified immunity, "the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia*, 305

F.3d 314, 323 (5th Cir. 2002).  The plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005).  Moreover, the plaintiff cannot rest on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the official's conduct.  *Id.*

### a.  *Excessive Force*

Gilbert alleges that seven Bryan police officers—Steven French, Demond Oliver, Travis Hines, Matthew Harrison, Al Hauke, Kyle Halbert, and Andrea Schooler—violated his constitutional right to be free from the use of excessive force when they fired on him while he was fleeing the Taqueria Arandas.[24]  The question before the Court is, first, whether the facts alleged by Gilbert establish a violation of a constitutional right.  *Hathaway v. Bazany*, 507 F.3d 312, 320 (5th Cir. 2007).

The Supreme Court has held that "all claims that law enforcement officials have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard rather than a substantive due process approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir. 1994).  "As in other Fourth Amendment contexts, however, the

---

[24]     Apparently, it could not be determined which officer actually fired the shots that hit Gilbert. Regardless, these defendants do not dispute that they fired their weapons at Gilbert.

'reasonableness' inquiry in an excessive force claim is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. In that regard, a certain amount of force is obviously reasonable when a police officer apprehends a dangerous, fleeing suspect. *See Scott v. Harris*, ___ U.S. ___, 127 S. Ct. 1769 (2007); *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). Thus, to succeed on an excessive force claim, a plaintiff must demonstrate that he suffered an "(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007).

In gauging excessiveness and objective unreasonableness, the Supreme Court has held that while deadly force may not be used against all fleeing felons, it is acceptable when "necessary to prevent . . . escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serous physical injury to the officer or others." *Garner*, 471 U.S. at 3. Indeed, "[i]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11–12. In applying this standard, courts are also directed to

consider "the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.  Thus, in analyzing an excessive force claim, courts are directed to "[pay] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

In this case, the Bryan police officers are entitled to qualified immunity because Gilbert has not carried his burden to raise a genuine issue of material fact that the officers used excessive force or acted unreasonably.  The record shows that at the time Bryan police officers arrived at the Taqueria Arandas, they had received information from a restaurant employee that armed, masked men had attacked another restaurant employee.  They had received information from a police dispatcher relaying threats heard over an open telephone line to the restaurant that "if he does not get any money, somebody is going to die."  Once on the scene, at least one officer observed a masked man, armed with a gun, inside the restaurant.  And significantly, the officers witnessed Gilbert and Hall exit the restaurant with a gun to the back of a hostage who was covered in blood.  Officers' decision to fire on Gilbert once he began to flee and

refused to comply with police instructions to stop was reasonably premised on their belief that Gilbert posed an immediate threat to officers and the public. Moreover, given the violence associated with robbery, the fact that Gilbert was ultimately found to be unarmed at the time he was shot is of no consequence. The threat posed by Gilbert was substantial and police were not obligated to allow Gilbert to escape arrest under these circumstances.

Gilbert's contention that he is innocent of the crimes for which he was found guilty at trial does not alter this conclusion.[25]  Even if, as he claims, Gilbert participated in the robbery of the Taqueria Arandas only under duress, and even if he did not assault the restaurant employees, based on the information available to the Bryan police officers, they reasonably could have believed that Gilbert posed a serious threat to the public and reacted in kind. *See Saucier*, 533 U.S. at 205 ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, . . . the officer would be justified in using more force than in fact was needed.").

Thus, in light of the facts known to the Bryan police officers at the time, their decision to fire their weapons at Gilbert was appropriate and reasonable. Gilbert's Fourth Amendment right against the use of excessive force was not violated and the officers are entitled to qualified immunity from suit.

---

[25]   Gilbert's conviction apparently is still on appeal. *See* Plaintiff's More Definite Statement [Doc. # 13], at 20.

However, even if the Court were able to conclude that the facts in this case somehow establish a constitutional violation, Gilbert has not raised a genuine fact issue that the officers infringed a "clearly established" right. *Collins*, 382 F.3d at 537. This is especially apparent given the "hazy border between excessive and acceptable force" when police seek to apprehend a fleeing, dangerous suspect. *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (quoting *Saucier*, 533 U.S. at 206); *see also Hathaway*, 507 F.3d at 320 n.5.  As the Supreme Court has noted, the test used to determine whether police officers have used excessive force against a suspect "must accommodate limitless factual circumstances," which requires that "the law be elaborated from case to case." *Saucier*, 533 U.S. at 205, 206; *see also Brousseau*, 543 U.S. at 199–200.

To this end, it has been held that police used excessive force when they shot a "young, slight, and unarmed" suspect fleeing the scene of a burglary.  *Garner*, 471 U.S. at 21 ("[T]he fact that [the plaintiff] was a suspected burglar could not, without regard to other circumstances, automatically justify the use of deadly force. [The defendant police officer] did not have probable cause to believe that [the plaintiff], whom he correctly believed to be unarmed, posed any physical danger to himself or others.").  Conversely, police were found to have acted reasonably when they opened fire on a robbery suspect, who fled the scene in a vehicle that ultimately crashed, after

the suspect—later found to be unarmed—refused to keep his hands in sight of the police. *Reese v. Anderson*, 926 F.2d 494, 500 (5th Cir. 1991). Similarly, a police officer had a reasonable basis to believe that he was in physical danger, and hence, was entitled to qualified immunity, after he shot a fleeing robbery suspect who the officer had been told "probably had a knife and was inebriated," even if the suspect was ultimately found to be unarmed. *Krueger v. Fuhr*, 991 F.2d 435, 439 (8th Cir. 1993); *see also Dudley v. Eden*, 260 F.3d 272 (6th Cir. 2001); *Ryder v. Topeka*, 814 F.2d 1412 (10th Cir. 1987)

Thus, as these cases show, this area is one in which the result depends very much on the facts of each case. The Court has uncovered no case that "squarely govern[s] the case here." *Brousseau*, 543 U.S. at 201. It is by no means "clearly established" that the Bryan police officers' violated the Fourth Amendment by shooting at Gilbert, an apparent perpetrator of an armed robbery. As such, the officers are entitled to qualified immunity on Gilbert's excessive force claim.

Finally, assuming *arguendo* that Gilbert had alleged a violation of a clearly established constitutional right, the Bryan police officers are nonetheless entitled to qualified immunity under the second prong of the immunity analysis.

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual

situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier*, 533 U.S. at 205–06; *see also Brosseau*, 543 U.S. at 599 ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted."); *Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994) ("[T]he Supreme Court intends to surround the police [officers] who make . . . on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases.").

In this case, Bryan police officers were operating under use of force procedures implemented by the Bryan Police Department.[26] These procedures directed officers to use only that degree of force "reasonably . . . necessary to protect the officer or another person from immediate danger of death or serious bodily injury" and required that officers employ deadly force only after exhausting reasonably available alternatives, such as "officer presence," "verbal direction," and "intermediate weapons."[27] The officers had been trained in the use of force and informed of the

---

[26]    *See* MSJ [Doc. # 58], Ex. D: "Bryan Police Department General Order: Use of Force."

[27]    *Id.*, at 1–3.

situations in which deadly force was appropriate and authorized.[28]  Even if the policy

was constitutionally deficient, the officers' conduct was in line with that policy—

which they had no reason to question—and was reasonable under the circumstances.

Thus, the officers are entitled to qualified immunity from this claim and summary

judgment in favor of Defendants Steven French, Demond Oliver, Travis Hines,

Matthew Harrison, Al Hauke, Kyle Halbert, and Andrea Schooler is granted.

Defendants French, Oliver, Hines, Harrison, and Hauke are dismissed from this suit.[29]

### b.    *Failure to Intervene*

Gilbert next alleges that Officers Candido Amaya, Dean Schwartzlander,

Andrea Schooler, Dennis Haynes, Steven Spillars, Ryan Bona, Stacy Pottinger, John

Sennett, and Kyle Halbert violated his civil rights by failing to intervene to protect

him when their fellow officers began firing at Gilbert.  "An officer who is present at

the scene and does not take reasonable measures to protect a suspect from another

officer's use of excessive force may be liable under [§] 1983."  *Hale v. Townley*, 45

F.3d 914, 919 (5th Cir. 1995).  Although the Fifth Circuit has not enunciated elements

of a § 1983 failure to intervene claim—at least outside of the context of the Eighth

---

[28]    *See id.*, at 2 ("[E]ach commissioned employee must be given a copy of this directive and trained in the department's policy on the use of force before being authorized to carry a firearm."); *see also* MSJ [Doc. # 58], Ex. E: "Officer Training Certificates."

[29]    Andrea Schooler and Kyle Halbert are named in both Gilbert's excessive force and failure to intervene claims.

Amendment and claims brought by prisoners against jail personnel—at least one court in the Fifth Circuit has looked to the First Circuit for guidance on this issue. *Spencer v. Rau*, No. SA-06-CA-760-RF, 2007 U.S. Dist. LEXIS 82081, *27 (W.D. Tex. Oct. 11, 2007). This Court sees no reason to depart from that approach.

The First Circuit has held that a police officer can be liable under § 1983 for failure to intervene "if the defendant was present when the force was used, observed the use of excessive force, was in a position where he could realistically prevent the force, and had sufficient time to prevent it." *Id.* (citing *Davis v. Rennie*, 264 F.3d 86, 97–98 (1st Cir. 2001)); *see also Lanigan v. Vill. of E. Hazel Crest*, 110 F.3d 467, 477 (7th Cir. 1997) (enunciating a similar test for failure to intervene); *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994) (same). Whether applying the First Circuit's multi-element approach, or looking to the Fifth Circuit's more general "reasonableness" approach, an essential element to a successful failure to intervene claim is the existence of a constitutional violation. As noted in Section III.A.2.a., *supra*, the Bryan police officers did not employ excessive force when they shot Gilbert and, hence, did not violate his Fourth Amendment rights. Without an underlying display of excessive force for officers to protect against, the officers are entitled to summary judgment on Gilbert's failure to intervene claim.

However, even if there was an unconstitutional use of force by some officers,

there is no indication that any of the officers named in Gilbert's failure to intervene claim had any time to act to prevent the shots from being fired.[30]  Gilbert has not contradicted police reports which establish that mere seconds elapsed from the time Gilbert exited the restaurant until the time he was shot.[31]  As a matter of law, under the circumstances presented, this is an insufficient amount of time for officers to appreciate and react to a possible use of excessive force, especially in light of the dangerous and quickly evolving situation created by Gilbert's actions.  *See Nowell v. Acadian Ambulance Serv.*, 147 F. Supp. 2d 495, 507 (W.D. La. 2001) (In order to be held liable under § 1983 for failing to protect a suspect from another officer's use of excessive force, "the officer must have had a reasonable opportunity to realize the excessive nature of the force and a reasonable opportunity to intervene to stop it.").  Thus, the Court finds no constitutional violation and these officers are entitled to qualified immunity on this claim.  Accordingly, summary judgment is granted in favor of Defendants Candido Amaya, Dean Schwartzlander, Andrea Schooler, Dennis

---

[30]   Indeed, it is not even clear that each of these officers was present at Gilbert's location when he was fired upon, which is a requirement for recovery on a theory of bystander liability. *See Hale*, 45 F.3d at 919; *see also Ibarra v. Harris County*, 243 F. App'x 830, 835 n.8 (5th Cir. 2007).  Some officers named in this claim appear to have been on the other side of the restaurant tending to Hall.  *See, e.g.*, MSJ [Doc. # 58], Ex. B-10:  "Report of Officer R. Bona," "Report of Officer D. Haynes."

[31]   *See* MSJ [Doc. # 58], Ex. B-1:  "Resident Incident Activity Summary," at 1–2 (recording, with time stamps, radio dispatches from the officers at the scene); Ex. B-3: "BPD Supplemental Case Report," at 5–7 (same).

Haynes, Steven Spillars, Ryan Bona, Stacy Pottinger, John Sennett, and Kyle Halbert, all of who are dismissed from this suit.

### c.   *Delayed Access to Medical Treatment*

Finally, Gilbert alleges that Officers Lori Anderson Berndt ("Anderson") and Steven Fry deprived him of his constitutional right to medical care by directing hospital employees to withhold treatment until Anderson and Fry completed their questioning of Gilbert.

"A pretrial detainee's constitutional right to medical care, whether in prison or other custody, flows from the procedural and substantive due process guarantees of the Fourteenth Amendment."[32]   *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000).  "Liability for failing to provide such care attaches if the plaintiff can show that a state official acted with deliberate indifference to a substantial risk of serious medical harm and that injuries resulted."   *Id.* (citing *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996)).  "Deliberate indifference" requires that the official have *subjective* knowledge of the risk of harm, which "cannot be inferred from a . . . failure to act reasonably."   *Hare*, 74 F.3d at 649.  Indeed "[d]eliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the

---

[32]   From the record, it is not clear whether Gilbert was under arrest while being questioned by Anderson and Fry.  *See* Supplement [Doc. # 68], Ex. 3: "Statement of Officer L. Anderson." However, the Court assumes he was "detained" for purposes of his constitutional claim.  *See Nerren v. Livingston Police Dep't*, 86 F.3d 469, 472–73 (5th Cir. 1996).

conscience of mankind." *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)); *see also Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) ("Deliberate indifference is an extremely high standard to meet." (internal quotation marks omitted)); *Stewart v. Murphy*, 174 F.3d 530 (5th Cir. 1990). Thus, mere negligence, or even gross negligence, is insufficient to establish subjective deliberate indifference. *Hare*, 74 F.3d at 645. Moreover, "[d]isagreement with medical treatment alone cannot support a claim under § 1983." *Gibbs v. Grimmette*, 245 F.3d 545, 549 (5th Cir. 2001); *see also Haddix v. Kerss*, 203 F. App'x 551, 553 (5th Cir. 2006) (citing *Varnardo v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991)).

Therefore, for Gilbert to prevail on his claim of deliberate denial of medical care, he "needs to establish more than the typical quantum of evidence necessary to overcome a qualified immunity defense. . . . [He] must show not only that the defendants' [alleged] actions in failing to provide [him] medical attention . . . were objectively unreasonable, but also that defendants intended the consequences of those actions." *Wagner*, 227 F.3d at 324.

In this case, Gilbert claims that after being shot by police, he was denied "all medical remedies . . . until he talked [to police] and told [them] what [they] wanted

to know."[33]  However, Defendants have provided undisputed evidence to the contrary.

Rather than being denied treatment, Gilbert was immediately treated by emergency

medical personnel, who transported him to St. Joseph Hospital in Bryan.[34]  Once at the

hospital, Gilbert was continually attended to by hospital personnel while physicians

assessed his injuries and decided on a course of action.[35]  Indeed, transcripts of

interviews of Gilbert by police demonstrate that Gilbert had conversations with

medical personnel and was regularly updated on their treatment assessments.[36]  In this

---

[33]     *See* Complaint [Doc. # 1], at 3g, 3h.  After Gilbert and Hall exited the restaurant, police were uncertain whether additional suspects and employees remained inside.  *See, e.g.*, MSJ [Doc. # 58], Ex. B-3: "BPD Supplemental Case Report,"  Documents provided by the officers and Gilbert indicate that once Gilbert was being tended to by medical personnel, police immediately questioned him regarding, *inter alia*, possible additional suspects.  *See id.*, at 10; Ex. B-7: "Transcript of Interview of Gilbert by Officer Anderson," at 1; Ex. B-8: "Transcript of Interview of Gilbert by Officers Fry and Anderson," 384–85.  Gilbert claimed that he and Hall, who Gilbert identified as "James Smith," were the only two individuals involved in the robbery.  *Id.*,  Ex. B-7: "Transcript of Interview of Gilbert by Officer Anderson," at 1.

[34]     *See* MSJ [Doc. # 58], Ex. B-1:  "Resident Incident Activity Summary," at 2 (transcript of police radio transmissions, including calls for medical assistance within seconds of Gilbert and Hall being shot); Ex. B-3: "BPD Supplemental Case Report," at 9–10 (transcript of police radio transmissions indicating that Gilbert was in an ambulance within minutes of being shot); Ex. F: "Gilbert Medical Records," at 307–12, 324, 335, 364–83; Ex. G: "Bryan EMS Report."

[35]     *See* MSJ [Doc. # 58], Ex. B-7: "Transcript of Interview of Gilbert by Officer Anderson"; Ex. B-8:  "Transcript of Interview of Gilbert by Officers Fry and Anderson."

[36]     *See* MSJ [Doc. # 58], Ex. B-8:  "Transcript of Interview of Gilbert by Officers Fry and Anderson," 388, 393, 394, 396, 414–15; Ex. B-9: "Transcript of Interview of Gilbert in ICU," 4–5.

         To the extent Gilbert simply disagrees with the course of treatment prescribed by his physicians and nurses, the Court notes that such a claim "constitutes disagreement with
                                                                                    (continued...)

regard, Gilbert's denial of medical care claim is patently legally insufficient and is dismissed.

However, Gilbert also claims that pain medication was impermissibly withheld from him by doctors—acting at the behest of Officers Anderson and Fry—so that Gilbert would be encouraged to speak with police.  In bringing this claim, Gilbert relies primarily on his own unsubstantiated assertions, though his contention that pain medication was not immediately administered does find support in the record.  The undisputed documentary evidence provided by Defendants indicates that Gilbert was at St. Joseph Hospital for approximately two hours before he was administered pain medication.  During that time, Officers Anderson and Fry appear to have questioned

---

[36]    (...continued)
medical staff, which is not actionable in a § 1983 proceeding." *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).

Gilbert continuously,[37] in spite of Gilbert's complaints of pain,[38] which were communicated to hospital staff.[39]

Whether the denial or withholding of pain medication to a pretrial detainee by police rises to the level of a constitutional violation necessarily depends on the facts of the case. *See Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993). "[I]n order to maintain a viable claim for delayed medical treatment there must have been deliberate indifference, which results in . . . substantial harm." *Id.* (internal citations omitted).

Various courts have held that the suffering of pain is sufficient to demonstrate

---

[37]    *See* MSJ [Doc. # 58], Ex. B-7: "Transcript of Interview of Gilbert by Officer Anderson"; Ex. B-8: "Transcript of Interview of Gilbert by Officers Fry and Anderson." Initially, the questioning appeared to focus on whether additional individuals were involved in the robbery and whether they were holding additional hostages in the restaurant. As noted previously, it was unclear to police whether Gilbert and Hall were the only perpetrators. *See supra* note 8 and accompanying text; *see also supra* note 33. The record shows that this uncertainty led police to treat the matter as a hostage situation long after Gilbert and Hall exited the restaurant. *See* MSJ [Doc. # 58], Ex. B-3: "BPD Supplemental Case Report," at 1; Ex. B-5: "Supplemental Report – A. Martinez," at 2; Ex. B-11: "Report of Officer S. Fry," at 2; Ex. B-17: "Report of Officer S. Pottinger," at 2; Ex. B-19: "Transcript of Interview of Officer D. Schwartzlander," at 4–5. However, the questioning of Gilbert later focused primarily on Gilbert's role in the crime.

[38]    *See* MSJ [Doc. # 58], Ex. B-7: "Transcript of Interview of Gilbert by Officer Anderson," at 1, 5; Ex. B-8: "Transcript of Interview of Gilbert by Officers Fry and Anderson," at 386, 388, 402, 406, 414; Supplement [Doc. # 68], Ex. 3: "Statement of Officer L. Anderson," at 2.

[39]    *See* MSJ [Doc. # 58], Ex. B-7: "Transcript of Interview of Gilbert by Officer Anderson," at 3 (Though labeled page "3", this is the second page of the exhibit; page 2 does not appear to have been provided by Defendants); Ex. B-8: "Transcript of Interview of Gilbert by Officers Fry and Anderson," at 414; Ex. F: "Medical Records of Stephen Gilbert," at 312; Ex. J: "Testimony of Nurse T. Shimek," at 117–18.

the requisite harm to support a delayed access to medical care claim, provided that "deliberate indifference" is established. *See Thomkins v. Belt*, 828 F.2d 298, 301 (5th Cir. 1987) (affirming a $4,500 jury award to a prisoner for "pain and discomfort" associated with a jail's three month delay in providing him treatment for a back injury); *see also McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999) (collecting cases); *King v. Busby*, 162 F. App'x 669, 671 (8th Cir. 2006); *Prewitt v. Roos*, 160 F. App'x 609, 610–11 (9th Cir. 2005); *Hanna v. Corr. Corp. of Am.*, 95 F. App'x 531, 533 (5th Cir. 2004); *Harden v. Green*, 27 F. App'x 173, 178 (4th Cir. 2001).   On the other hand, one district court within the Fifth Circuit has held that a prisoner who was denied pain medication following the suturing of a head wound failed to demonstrate "a sufficiently serious medical  need" to support his 42 U.S.C. § 1983 claim.  *Hill v. Bowles*, No. 3:02-CV-2527-P, 2003 U.S. Dist. LEXIS 10335, *13–*14 (N.D. Tex. June 18, 2003) (Mag. J. Sanderson).  Similarly, that same court held that a pretrial detainee who suffered an "infect[ion] and extreme[] pain" after prescribed pain medication was withheld by jail staff did not allege "any adverse consequences[,] . . . apart from headaches,"sufficient to establish a denial of medical care claim.  *Calton v. City of Garland*, No. 3:02-CV-2215, 2003 U.S. Dist. LEXIS 4341, *7 (N.D. Tex. Mar. 20, 2003) (Mag. J. Sanderson); *see also Thompson v. Worch*, 6 F. App'x 614, 616 (9th Cir. 2001) ("At most, the officers delayed [the plaintiff's] receiving pain

medication for less than one day, which is insufficient to demonstrate deliberate indifference to a serious medical need."). *But see Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) ("With this type of injury [a broken foot], it may be that deliberately indifferent delay [in administering pain medication], no matter how brief, would render defendants liable as if they had inflicted the pain themselves. Deliberately inflicted pain, . . . does not become unimportant and unactionable . . . simply because the pain produced in only momentary.").

In this case, the record is materially incomplete.  There is conflicting evidence regarding Gilbert's doctors' reasons for not administering pain medication, despite his severe medical condition, for at least two hours after Gilbert's arrival at the hospital.[40] There also is a suggestion in the medical records that the police officers directed the decision about when nurses should administer this medication. The Court cannot discern with any reliability whether the delay was medically or otherwise justified, and whether it was the treating physicians or the police officers who made the pain medication decisions.

_____

[40]     For example, Gilbert reported allergies to iodine and penicillin, which appear to have influenced physicians' treatment decisions.  *See* MSJ [Doc. # 58], Ex. B-7: "Transcript of Interview of Gilbert by Officer Anderson," at 6.  Similarly, there is a suggestion in the record that doctors needed Gilbert to be "aware of what [was] going on" while treatment decisions were being considered.  *See id.*, at 3.  In addition, Gilbert alleges that uncertainty as to how the hospital was to be paid for treating Gilbert led to delays.  *See* Plaintiff's More Definite Statement [Doc. # 13], at 19.  Finally, as discussed *infra*, there is evidence that pain medication was withheld so that Gilbert would be available to talk to police.

More specifically, Defendants have provided an affidavit from Officer Anderson,[41] state court trial testimony from Officer Fry,[42] and an affidavit from one of Gilbert's treating physicians,[43] each stating that police never directed physicians to withhold medication.  However, these affidavits are inconsistent with other record evidence that the pain medication was withheld by physicians so that Gilbert would be available to talk to police.  Officers Anderson and Fry recorded interviews of Gilbert conducted while he was in the St. Joseph Hospital emergency room.[44] Transcripts of those interviews include conversations between officers, Gilbert, and hospital personnel.  According to one such transcript, in response to Gilbert's request for medication, an unnamed doctor stated to him—in the presence of Officer Anderson—"No, you'll have some pain medicine ordered but they [police] need you to be awake to answer their questions right now . . . ."[45]  Further, Gilbert's hospital records, the authenticity of which has not been disputed, include nurse's notes indicating that at 11:25 p.m., doctors were made aware of Gilbert's complaints of

---

[41]     *See* MSJ [Doc. # 58], Ex. K: "Affidavit of L. Anderson," ¶¶ 9–10.

[42]     *See* MSJ [Doc. # 58], Ex. L: "Testimony of S. Fry in *State v. Gilbert*," at 21–23.

[43]     *See* MSJ [Doc. # 58], Ex. H: "Affidavit of Dr. J. Mason."

[44]     *See* Supplement [Doc. # 68], Ex. 3: "Affidavit of Officer L. Anderson," at 6, ¶ 6.

[45]     *See* MSJ [Doc. # 58], Ex.  B-7:  "Transcript of Interview of Gilbert by Officer Anderson," at  6–7.

pain, but directed the reporting nurse "to wait until police are done speaking to [Gilbert]." The nurse further noted that at 12:35 a.m., "police officers [were] still at [Gilbert's bedside]," at 12:50 a.m. "police officers left," and at 12:58 a.m. "morphine sulfate . . . [was] given for . . . pain."[46]

That being said, the record also suggests that Officers Anderson and Fry expressed concern regarding Gilbert's condition and comfort.[47]   There is evidence that officers aided medical personnel when needed, and that they did not intend to impede his treatment.[48]   There is also a suggestion in the documentary evidence that the officers voluntarily ceased their questioning upon request of medical personnel and asked Gilbert as they left whether he would be willing to speak with police again after he got "a little more comfortable in the ICU and maybe ha[d] some pain medicine."[49] But, it is noted that officers apparently were communicating with hospital personnel off the record.[50]

Thus, whether timing of administration of pain medication to Gilbert was

---

[46]     *See* MSJ [Doc. # 58], Ex. F:  "Medical Records of Stephen Gilbert," at 312.

[47]     *See* MSJ [Doc. # 58], Ex. B-8:  "Transcript of Interview of Gilbert by Officers Fry and Anderson," at 388, 402, 404, 407, 414.

[48]     *See id.*, at 393, 396, 402, 414; *see also* MSJ [Doc. # 58], Ex. K: "Affidavit of L. Anderson," ¶ 6.

[49]     *See* MSJ [Doc. # 58], Ex. B-8:  "Transcript of Interview of Gilbert by Officers Fry and Anderson," 418.

[50]     *See id.*, at 404, 414.

dictated by law enforcement personnel or the medical providers cannot be determined at this juncture. There remains a question of material fact as to why Gilbert did not receive pain medication until after the police left his bedside. Because resolution of these questions bears on whether Officers Anderson and Fry were "deliberately indifferent" to Gilbert's "serious medical needs," *see Wagner*, 227 F.3d at 324, the Court is unable to conclude that Gilbert's rights were not violated.

Moreover, assuming *arguendo* that officers did direct medical personnel to withhold pain medicine from Gilbert, such conduct may well violate the "clearly established" right of a detainee to be free from the "wanton disregard" of law enforcement to a "serious medical need[]." *See Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006). Further, whether such conduct would be nonetheless be "objectively reasonable," *see Collins*, 382 F.3d at 537, cannot be determined from the record. Given that police did not know, once Gilbert and Hall were apprehended, whether additional suspects remained inside the Taqueria Arandas,[51] a decision to withhold pain medicine for a short period of time so that Gilbert would remain clear-headed and perhaps shed light on the situation would likely be reasonable. However, transcripts of interviews of Gilbert conducted by Officers Anderson and Fry suggest that their interview went well beyond questions about how many suspects were involved in the

---

[51]        *See supra* notes 8, 37.

robbery[52]—questions that Gilbert answered early in the interview.[53]

Thus, based on the evidence before the Court, it cannot be concluded that officers are entitled to qualified immunity on this claim.   Accordingly, summary judgment is denied.

### d.    *Equal Protection Violations*

The Equal Protection Clause requires that similarly situated persons be treated alike.  *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985).   To establish an equal protection claim, a plaintiff must demonstrate that (1) the state created two or more classifications of similarly situated prisoners that were treated differently; and (2) the classification had no rational relation to any legitimate governmental objective.  *See Johnson v. Rodriguez*, 110 F.3d 299, 306–07 (5th Cir. 1997).   A plaintiff may also state an equal protection claim if he alleges that he was subjected to disparate treatment that was motivated by illegitimate discriminatory animus or ill-will.  *See Shipp v. McMahon*, 234 F.3d 907, 916 (5th Cir. 2000) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

In this case, Gilbert alleges that Bryan police officers violated his constitutional

---

[52]    *See* MSJ [Doc. # 58], Ex. B-8: "Transcript of Interview of Gilbert by Officers Fry and Anderson."

[53]    *See* MSJ [Doc. # 58], Ex. B-7: "Transcript of Interview of Gilbert by Officer Anderson," at 1; Ex. B-8: "Transcript of Interview of Gilbert by Officers Fry and Anderson," at 384–85.

rights when they engaged in "racial profiling"and "racial stereotyping."  Gilbert claims that the officer impermissibly assumed that because African-American men were potentially involved in a crime, they must be armed and hence, could be fired upon.[54]  However, putting aside that the officers had substantial reasons to believe that Gilbert was armed, Gilbert fails to allege or show that he has been treated differently from other similarly situated suspects encountered at the scene of an aggravated robbery.  Likewise, he does not allege facts showing that he was singled out for ill treatment for any impermissible reason.  Thus, Gilbert has not demonstrated the requisite disparate treatment and, therefore, he fails to state a claim upon which relief can be granted under the Equal Protection Clause.  Defendants are entitled to summary judgment on these claims.

### B.    Claims against the City of Bryan and the Bryan Chief of Police

Gilbert's § 1983 claims are also alleged against the City of Bryan, which he claims operated pursuant to a custom of denying constitutional guarantees to criminal suspects, and Bryan Chief of Police Bobby Whitmore, who he claims failed to properly train and supervise Defendant police officers.[55]  As noted above, the only

---

[54]    *See* Complaint [Doc. # 1], at 3b–3i.

[55]    As discussed in note 2, *supra*, Gilbert's "failure to train and supervise" claim was improperly alleged against Assistant Chief of Police Peter Scheets.  The Court served Chief Whitmire as the proper defendant for this claim.

colorable constitutional claim asserted by Gilbert concerns the possibly delayed administration of pain medication to Gilbert by St. Joseph Hospital medical staff, allegedly acting at the direction of law enforcement.  Thus, his claims against the City and Chief Whitmire are analyzed only as to this specific cause of action.

### 1.     Violation of 42 U.S.C. § 1983

As noted above, in order to establish liability under § 1983 there must be (1) a deprivation of a right secured by federal law, (2) that occurred under color of state law, and (3) was caused by a state actor.  *Victoria W. v. Larpenter,* 369 F.3d 475, 482 (5th Cir. 2004).  There are essentially five avenues for establishing local government liability under § 1983.  A plaintiff may assert liability based on: (1) an illegal official governmental policy or decision; (2) an illegal custom or practice within the government; (3) a custom or policy of inadequate training, supervision, discipline, screening, or hiring; (4) illegal conduct of an official with final policymaking authority; or (5) a municipality's ratification of illegal acts.  *See Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 694 (1978); *see also City of Canton v. Harris*, 489 U.S. 378, 385-87 (1989); *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 736–37 (1989); *Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir. 1985).

Gilbert has alleged that the City of Bryan contracts, or otherwise has an agreement, with St. Joseph Hospital to provide medical care for pretrial detainees such

as himself.[56]  He further alleges that pursuant to this arrangement, hospital personnel

agree to delay treatment of detainees when police so request.  Given some evidence

in the record that pain medication was withheld from Gilbert while police were

questioning him, and was ultimately administered eight minutes after police left his

bedside,[57] the Court finds that Gilbert has adequately pled a claim against the City and

that there are sufficient disputed fact issues bearing on this claim to preclude summary

judgment.[58]

### 2.    Failure to Train and Supervise

Personal involvement is an essential element of a civil rights cause of action,

meaning that there must be an affirmative link between the injury and the defendant's

conduct.  *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) (citing *Rizzo v.

Goode*, 423 U.S. 362, 371–72 (1976)).  Thus, a supervisory official may not be held

for a civil rights violation under a policy of *respondeat superior* or vicarious liability.

*Monell*, 436 U.S. at 691.  Supervisory officials can only be held liable if the plaintiff

---

[56]    *See* Plaintiff's More Definite Statement [Doc. # 13], at 28.

[57]    *See* MSJ [Doc. # 58], Ex. F:  "Medical Records of Stephen Gilbert," at 312.

[58]    The City argues that it should prevail because Gilbert has not offered any evidence of a
policy or custom necessary to impose liability under § 1983.  Although the Court has treated
Defendants' motion as a motion for summary judgment, it has done so for the purposes of
assessing whether any Defendant police officers are entitled to qualified immunity.  The
record is obviously incomplete and there has been no discovery.  Thus, in the interests of
justice, as to Gilbert's claims against the City, the Court will treat Defendants' motion as a
motion to dismiss.

demonstrates (1) the supervisor's personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the deprivation.  *See Thompkins v. Belt*, 828 F.2d 298, 303–04 (5th Cir. 1987); *see also Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997) ("[T]he misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor.").  Supervisory liability exists without overt personal participation in an offensive act only if supervisory officials implement a policy "so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Thompkins*, 828 F.2d at 304 (quoting *Granstaff v. City of Borger*, 767 F.2d 161, 169 (5th Cir. 1985)).

To this end, a municipality and supervisors can be liable for "failure to train" and "failure to supervise."  *See Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000); *Estate of Davis v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005).  However, where a plaintiff alleges a failure to train or supervise, "'the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'" *Estate of Davis*, 406 F.3d at 381(quoting *Smith v. Brenoettsy,* 158 F.3d 908, 911–12 (5th Cir. 1998)).  "'[D]eliberate indifference' is a

stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs v. Brown,* 520 U.S. 397, 410 (1997). "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brenoettsy,* 158 F.3d at 912. No cause of action exists under § 1983 for mere negligent supervision. *See Monell*, 436 U.S. at 691; *Sappington v. Ulrich,* 868 F. Supp. 194, 199 (E.D. Tex. 1994); *see also Estate of Davis*, 406 F.3d at 381 ("Deliberate indifference requires a showing of more than negligence or even gross negligence."(citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Alton v. Texas A&M University,* 168 F.3d 196, 201 (5th Cir. 1999).

In this case, Gilbert has alleged that Chief Whitmire demonstrated "deliberate indifference" to his medical needs by failing to train and supervise Bryan police officers in the proper treatment of injured detainees. Drawing all reasonable inferences in Gilbert's favor, the Court concludes that he has alleged a viable cause of action against Chief Whitmire. Based on the limited record before the Court, it cannot determined why Gilbert did not receive pain medication for more than two hours after he arrived at St. Joseph Hospital, whether Officers Anderson or Fry

requested a delay in the administration of pain medication, and whether, if officers did request a delay, why they did so.  If Anderson and Fry did intervene, it cannot be determined at this stage of the case whether they did so in conformity with a formal policy or an "informal" but "pervasive" custom of the Bryan Police Department.  *See In re Foust*, 310 F.3d 849, 861–62 (5th Cir. 2002).  Dismissal, therefore, is denied as to this claim.

### C.   Claims against Brazos County Sheriff Christopher Kirk

Finally, Gilbert also names Brazos County Sheriff Christopher Kirk as a defendant, claiming that Kirk is a policymaker for Brazos County, but suggesting that Kirk somehow has authority over the City of Bryan and/or Bryan police officers.[59] Pursuant to the Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (codified as amended in scattered sections of the U.S.C.), a court may dismiss a case brought by a prisoner at any time if it determines that the complaint, *inter alia*, fails to state a claim upon which relief may be granted. 28 U.S.C. § 1915(e)(2)(B). Gilbert fails to state a claim against Sheriff Kirk in this instance.

In order to successfully plead a cause of action in § 1983 cases, a civil rights plaintiff must "enunciate a set of facts that illustrate the defendants' participation in the wrong alleged."  *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986).

---

[59]     *See supra* note 2.

Personal involvement is an essential element of a civil rights cause of action, meaning that there must be an affirmative link between the injury and the defendant's conduct. *See Thompson*, 709 F.2d at 382 (citing *Rizzo*, 423 U.S. at 371–72).

Gilbert sues Sheriff Kirk in his official capacity as a supervisory official.  As noted above, a supervisor may not be held liable for a civil rights violation under a theory of *respondeat superior* or vicarious liability.  *Monell*, 436 U.S. at 691; *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003).  Supervisory officials can only be held liable if the plaintiff demonstrates either: (1) the supervisor's personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the deprivation, such as where a supervisor implements a legally deficient policy that substantially leads to a constitutional deprivation.  *Thompkins*, 828 F.2d at 303–04.

Gilbert fails to allege any facts showing that Sheriff Kirk was personally involved in the events surrounding the robbery of the Taqueria Arandas or that Gilbert suffered any harm as the result of a Brazos County policy for which Sheriff Kirk was responsible.  Gilbert's conclusory allegations and generalized assertions are not sufficient to state a claim; particular facts are required to specify the personal involvement of each defendant.  *See Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992); *Fee v. Herndon*, 900 F.2d 804 (5th Cir. 1990).  Absent a showing that Sheriff

Kirk was personally involved, or that the incident that Gilbert complains of was caused by a Brazos County policy enforced by Sheriff Kirk, Gilbert fails to state a valid claim upon which relief can be granted under 42 U.S.C. § 1983. Accordingly, the claims against Sheriff Kirk merit dismissal under 28 U.S.C. § 1915(e)(2)(B).

In addition, in his "More Definite Statement" of his case, Gilbert, in explaining Kirk's alleged involvement in this case, asserts that evidence was produced at his robbery trial that he was in possession of a large amount of money when he was apprehended at the Taqueria Arandas. However, Gilbert claims that no such money was listed as his property when he entered the Brazos County jail.[60] It is not clear whether Gilbert is complaining that he never had the money, or whether he is complaining that he did, but that it was taken from him by jail officials. In either event, Gilbert has failed to state a claim against Sheriff Kirk.

To the extent Gilbert is claiming that he was never in possession of any money at the Taqueria Arandas, Gilbert's allegations concern proof that was presented at his trial. At that trial, Gilbert was convicted and sentenced to prison for aggravated robbery. Thus, if Gilbert seeks monetary damages for alleged violations of his civil rights in connection with his conviction and imprisonment, his claim lacks merit. To recover damages based on allegations of "unconstitutional conviction or

---

[60]     *See* Plaintiff's More Definite Statement [Doc. # 13], at 26–29.

imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a [civil rights] plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determinations, or called into question by a federal court's issuance of a writ of habeas corpus [under] 28 U.S.C. § 2254." *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). A claim for damages that bears a relationship to a conviction or sentence that has not been so invalidated is not cognizable under 42 U.S.C. § 1983. *Id.* Therefore, if a judgment in favor of the plaintiff would "necessarily imply the invalidity of his conviction or sentence," then the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. *Id.*

Gilbert does not allege or show that the conviction at issue has been overturned or otherwise invalidated. In fact, Gilbert claims that his conviction was appealed in June 2006, but that he does not know the status of his case.[61] Because Gilbert's allegation would, if true, necessarily implicate the validity of his conviction, his civil rights claim about the money that was allegedly in his possession is not cognizable under 42 U.S.C. § 1983 at this time and his claim must be dismissed with prejudice. *See Johnson v. McElveen*, 101 F.3d 423, 424 (5th Cir. 1996) (explaining that claims

---

[61]    *See* Plaintiff's More Definite Statement [Doc. # 13], at 20–21.

barred by *Heck* are "dismissed with prejudice to their being asserted again until the *Heck* conditions are met").[62]

Likewise, to the extent that Gilbert is alleging that he was in possession of money that was not inventoried at the jail and that Sheriff Kirk is somehow liable for his missing personal property, Gilbert fails to state a valid claim under 42 U.S.C. § 1983. Whether there is a negligent, or even intentional, deprivation of property by state officials that is random and unauthorized does not rise to the level of a constitutional violation if state law provides an adequate post-deprivation remedy. *See Hudson v. Palmer*, 468 U.S. 517, 533–34 (1984); *Murphy v. Collins*, 26 F.3d 541, 543–44 (5th Cir. 1994). It is well established that Texas provides a remedy for inmates whose property has been taken or destroyed improperly. *See Myers v. Klevenhagen*, 97 F.3d 91, 95 (5th Cir. 1996); *Marshall v. Norwood*, 741 F.2d 761, 764 (5th Cir. 1984); *Aguilar v. Chastain*, 923 S.W.2d 740, 743–44 (Tex. Crim. App. 1996); *see also* TEX. GOV'T CODE §§ 501.007, 501.008. Accordingly, Gilbert's allegation that Sheriff Kirk is somehow responsible for Gilbert's missing personal property fails to state a claim for which relief can be granted under 42 U.S.C. § 1983.

---

[62]    Gilbert also claims that his Fifth Amendment rights against self-incrimination were violated by various Bryan police officers when he was questioned by police prior to being given his *Miranda* warnings, *see* Complaint [Doc. # 1], at 3c, 3d, 3e, and that at least one Bryan police officer falsified document related to the robbery, *see id.*, at 3f. For the same reasons as those stated in the accompanying text, these claims are not cognizable in this case and are dismissed.

Thus, all claims against Sheriff Kirk are dismissed.

### D.      Claims against St. Joseph Hospital and Hospital Employees

Finally, Gilbert has alleged a § 1983 claim against St. Joseph Hospital, Dr. John Mason, Nurse Tracy Shimek, and two "John Does" for withholding medical treatment at the direction of law enforcement.  As discussed in Section III.A.2.c, *supra*, the evidence before the Court establishes that Gilbert was treated by St. Joseph Hospital and its staff immediately upon his arrival.  However, Gilbert's claim that pain medication was impermissibly withheld from him by medical staff, possibly in complicity with Bryan police officers, finds some support in the record.

Section 1983 affords a remedy against state actors only.  In other words, "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Lugar v. Edmundson Oil Co.*, 457 U.S. 922, 936 (1982).  This means that "the party charged with the deprivation must be a person who may fairly be said to be a state actor," that is, one who is in fact a state official, one who "has acted with or has obtained significant aid from state officials," or one whose "conduct is otherwise chargeable to the State." *Id.* at 937.  Private individuals generally are not construed to act under color of law, and accordingly, are not considered state actors. *Id.* at 941.  Further, "private misuse of a state statute does not describe conduct that

can be attributed to the State." *Id.*  However, a private individual may act under color of law in certain circumstances, such as when a private person is involved in a conspiracy or participates in joint activity with state actors. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–52 (1970).  Private individuals who act in concert with a state official may still be held liable under § 1983 if they "jointly engaged with [the] state official[] in the challenged action." *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980); *see also Taylor v. Gibson*, 529 F.2d 709, 715 (5th Cir. 1976) ("It is now well established that private persons may be sued under [§] 1983 when they are acting in conspiracy or collusion with state officials.").

A civil rights plaintiff claiming conspiracy must allege facts showing that the defendants agreed to commit an illegal act.  *See Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982).  Absent specific facts showing that the private defendants knowingly participated in the alleged conspiracy by acting together with state officials to deprive a plaintiff of his constitutional rights, the plaintiff fails to state an actionable claim for conspiracy.  *See Ballard v. Wall*, 413 F.3d 510, 518–19 (5th Cir. 2005).

In this case, Gilbert has alleged that St. Joseph employees, acting in concert with Bryan police, violated his constitutional right to medical care by denying him pain medication for more than two hours.  Notwithstanding sworn statements by Dr.

Mason and St. Joseph Hospital denying wrongdoing,[63] Gilbert's allegations are supported by evidence that one of his treating doctors declined to administer pain medication until after Officers Anderson and Fry ceased their questioning of him. Indeed, his nurse did not give Gilbert that medication until eight minutes after Officers Anderson and Fry left Gilbert's bedside.

It is certainly possible that Gilbert's physicians were acting pursuant to legitimate hospital and medical protocols, and without any direction from law enforcement.  However, the record before the Court it too limited to decide the questions of material fact relating to whether Gilbert's doctors or the hospital may be considered state actors for purposes of § 1983 and whether the hospital had a policy or custom of withholding pain medication to permit police to question injured suspects.  Questions of material fact also exist as to the bases for Gilbert's doctors' decisions concerning the timing of administration of pain medication.  Thus, the Court will authorize service of process on St. Joseph Hospital,[64] Dr. John Mason, Jr. and Dr.

---

[63]     *See* MSJ [Doc. # 58], Ex. H: "Affidavit of Dr. John A. Mason, Jr."; Ex. I: "Affidavit of St. Joseph Hospital V.P. of Professional Services, Doris Redman."

[64]     As discussed in Section III.B.2, *supra*, there is no liability under § 1983 on a theory of *respondeat superior*.  However, Gilbert has alleged that St. Joseph Hospital physicians withheld pain medication from him pursuant to a hospital custom or policy, as is required to impose liability on St. Joseph Hospital.

Charles B. Williams.[65]

Because it appears from the record that Nurse Shimek lacked authority to prescribe medication for Gilbert, there is no factual basis to impose liability on her, or on any other nurse, for this claim.  *See also* TEX. OCC. CODE § 301.002(2)(C). Accordingly, Ms. Shimek and "Nurse Jane Doe" are dismissed from this suit.

## IV.    CONCLUSION

For all the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment [Doc. # 58] is **GRANTED IN PART and DENIED IN PART.**  The parties may proceed on Gilbert's claim that he was impermissibly denied pain medication by St. Joseph Hospital, by or through its employees, acting in concert with Officers Anderson and Fry, pursuant to Hospital and/or City of Bryan policy.  The parties may also proceed on Gilbert's claim that Chief of Police Bobby Whitmire, as a policymaker for the City of Bryan Police Department, failed to adequately train Officers Anderson and Fry in the proper treatment of a detainee with serious medical needs.

---

[65]    Gilbert named a "Dr. John Doe" in his Complaint.  *See* Complaint [Doc. # 1], at 3i–3j.  A review of Gilbert's medical records shows that his two treating physicians at the time of his admission to the hospital were Dr. John Mason, Jr. and Dr. Charles B. Williams.  *See* MSJ [Doc. # 58], Ex. F:  "Medical Records of Stephen Gilbert," at 307–11.

**SIGNED** at Houston, Texas, this 12<u>th</u> day of February, 2008.

Nancy F. Atlas
United States District Judge