# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN GILBERT, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-3986 |
| | § | |
| STEVEN FRENCH, *et al.*, | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

This civil rights action stems from an armed robbery involving hostages committed by Plaintiff Stephen Gilbert ("Gilbert") and an accomplice at a Taqueria Arandas in Bryan, Texas. As he attempted to flee the scene, law enforcement officers shot Gilbert through both shoulders. Gilbert was taken to the hospital and admitted to the emergency room at approximately 10:30 p.m. Pain medication, morphine sulfate, was ordered at 11:45 p.m. and administered at 12:58 p.m. Gilbert alleges that the administration of morphine sulfate was intentionally delayed by law enforcement and attending health care providers in order to facilitate police questioning. Claiming that the delay violated his civil rights, Gilbert filed the instant suit under 42 U.S.C. § 1983.

Pending before the court are several motions. Defendants Detective Lori Anderson Berndt ("Anderson"), Detective Stephen Fry ("Fry"), and the City of Bryan, Texas (the "City") (collectively, the "City Defendants") filed a Motion for Summary Judgment [Doc. # 161].[1] Defendants Doctor John Mason ("Dr. Mason") [Doc. #

---

[1] Gilbert filed a response [Doc. # 166], and the City Defendants replied [Doc. # 170]. The City Defendants have also filed a Motion to Stay Trial Setting Pending (continued...)

159],[2] Doctor Charles Williams ("Dr. Williams") [Doc. # 163],[3] and St. Joseph Regional Health Center ("St. Joseph Hospital" or "Hospital") [Doc. # 162][4] have also each filed motions for summary judgment.  The motions are ripe for decision.  Upon review of all pertinent matters of record and applicable law, the Court concludes that each Defendant's motion should be **granted**.[5]

## I.    FACTUAL BACKGROUND

Plaintiff, Texas Department of Criminal Justice ("TDCJ") inmate Stephen Gilbert, alleges that after being shot in both shoulders by law enforcement officers, who were attempting to apprehend him while he was fleeing an armed robbery, he was impermissibly denied pain medication by physicians or other medical personnel at St. Joseph Hospital.  Gilbert asserts that the decision to withhold pain medication was made at the behest of or, in agreement with, City law enforcement officers and was intended to coerce Gilbert—a suspect in the robbery—into answering the officers' questions concerning the crime.  At some point following the questioning, Gilbert was arrested and charged with aggravated robbery with a deadly weapon.  He was subsequently found guilty and sentenced to serve thirty years in Texas prison.

---

[1]        (...continued)
Determination of Motion for Summary Judgment [Doc. # 180].  That motion is denied as moot.

[2]        Gilbert filed a response [Doc. # 167].

[3]        Dr. Williams' motion is a Motion to Re-Urge His Motion for Summary Judgment, [Doc. # 130].  Gilbert filed a response [Doc. # 168].

[4]        Gilbert filed a response [Doc. # 169], and St. Joseph replied [Doc. # 171].

[5]        Gilbert also filed a Motion to Exclude Expert Testimony of R. Lynn Rea [Doc. # 160].  Because the Court does not rely on Dr. Rea's testimony in any way, and because the Court grants the remaining Defendants' motions for summary judgment, this motion is denied as moot.

A.      **The Robbery**

On December 19, 2004, at approximately 9:30 p.m., Gilbert and another man, Michael Hall ("Hall"), entered a Taqueria Arandas restaurant in Bryan, Texas. According to witnesses, Gilbert and Hall were both wearing masks over their faces; Gilbert was armed with a piece of pipe and Hall was carrying a gun.  Upon entering the restaurant, Gilbert and Hall assaulted and restrained four of the five employees in the building.  The fifth employee was able to exit the restaurant and contact police. However, it was not clear from her call how many men were robbing the restaurant or how many employees remained trapped inside.  While police were en route, Gilbert and Hall demanded money from and robbed the employees at gunpoint.

Numerous police units quickly arrived on the scene and surrounded the restaurant.  While positioning themselves, police learned that a 911 dispatcher heard over an open telephone line to the restaurant a male stating: "If they don't get no money someone is gonna die."[6]  During this time, an officer also observed through a restaurant window a masked man armed with a gun.

Soon thereafter, Hall, still masked, opened and looked out of the back door of the restaurant.  Police announced themselves and ordered Hall to surrender.  He refused and went back into the restaurant.  A few minutes later, the door opened again and three men—Gilbert, Hall, and a hostage—exited.  The hostage, Domingo Reyes ("Reyes"), was covered in blood and was being used by Gilbert and Hall as a shield between them and the police.

Police immediately demanded that Gilbert and Hall show their hands and get down on the ground.  Both refused.  Hall then shoved the hostage towards the police,

---

[6]      Transcript of 911 Call ("Transcript of 911 Call"), Exh. B-2 to Defendants' First Motion for Summary Judgment [Doc. # 58], at 5.

revealing a large black handgun pointed at the officers.  Gilbert and Hall immediately ran in opposite directions, ignoring police commands to stop.  The officers then fired, hitting both Gilbert and Hall.  Hall ultimately died from his injuries.  Gilbert was shot twice—once in each shoulder—and within minutes was transported by ambulance to St. Joseph Hospital.  Reyes was also transported to the Hospital for his injuries.

While Gilbert and Reyes were waiting for transport to the hospital, an unidentified officer reported that either Gilbert or Reyes (the transcript of officer radio communication does not identify which individual) told him that there were only two people involved in the robbery.[7]  However, because earlier reports indicated that there were three robbers, the responding officers were concerned that there was at least one remaining suspect holding at least three hostages.[8]  For almost an hour afterwards, from 10:22 p.m. to 11:08 p.m., the police continued to wait outside the restaurant for a tactical response team and civilian negotiators.[9]  As the police waited, a 911 operator continuously monitored the phone line inside the restaurant that had remained open. Every few minutes the 911 operator reported to police, "phone line open, still no sounds inside."[10]

At 11:20 p.m., the 911 operator heard movement inside the restaurant.[11]  At 11:34 p.m., the Bryan Assistant Chief of Police and one or more other officers at the

---

[7]    *See* Bryan Police Department Supplement Report ("BPD Supplement Report"), Exh. B-3 to Defendants' First Motion for Summary Judgment [Doc. # 58], at 10.

[8]    *See* Supplemental Report of A. Martinez ("Martinez Supplemental Report"), Exh. B-5 to Defendants' First Motion for Summary Judgment [Doc. # 58] , at 1.

[9]    *See* BPD Supplement Report, Exh. B-3, at 10–11.

[10]   *See* Resident Incident Activity Summary ("Resident Incident Activity Summary"), Exh. B-1 to Defendants' First Motion for Summary Judgment [Doc. # 58], at 2–4.

[11]   *See id.* at 4.

scene were informed that either Reyes or Gilbert were at the hospital undergoing a CT scan and could not be interviewed.[12]  Thirty minutes later, at 11:50 p.m., the 911 operator again heard movement inside the store.[13]  At the same time, officers observed a man with blood on him, holding a butcher knife, and moving inside the store.[14] Seconds later, the 911 operator reported that the phone line had been disconnected.[15]

Moments later, an employee left the restaurant and tried to flee in his car that was parked outside the store.[16]  The employee noticed someone wearing black and holding a gun, got scared, and ran back inside.[17]  At some point between 11:50 p.m. and 12:12 a.m., a female employee called 911.[18]  She told the 911 operator handling the call that she thought the suspects were still inside the building.[19]  Officers directed her to exit the front of the restaurant with two other employees and they quickly complied.[20]

By 12:12 a.m. on December 20, 2004, all the employees had made it to safety,

---

[12]     *See* BPD Supplement Report, at 22.

[13]     *See* Resident Incident Activity Summary, at 5.

[14]     *See id.*; BPD Supplement Report, at 24.

[15]     *See* Resident Incident Activity Summary, at 5.

[16]     *See id.* at 5–6; Martinez Supplemental Report, at 4.

[17]     *See* Resident Incident Activity Summary, at 5–6; Martinez Supplemental Report, at 4, 9.

[18]     *See* Martinez Supplemental Report, at 4.

[19]     *See id.*

[20]     *See id.*; Resident Incident Activity Summary, at 6.

but gave contradictory reports to the police.[21]  One employee reported that no one else was inside the building.[22]  However, another employee reported that an employee named Domingo was still inside the building, too scared to come out.[23]  At 12:32 a.m., police were still trying to verify whether the Domingo referred to by the employees was the same Domingo Reyes who had been used as a hostage in the initial confrontation and had already been taken to the hospital.[24]

Meanwhile the police were making preparations to enter the building.[25]  Police ultimately entered the building at 1:24 a.m.[26] and at 1:59 a.m. the building was declared clear and secure.[27]

## B.    Gilbert at St. Joseph Hospital

Gilbert was admitted into the Emergency Room of St. Joseph Hospital at 10:28 p.m. on December 19, 2004.  Upon arrival, Gilbert was conscious and rated his level of pain as an "8" on a scale of 1 to 10.[28]  Dr. Charles Williams, the Emergency Room

---

[21]    *See* Martinez Supplemental Report, at 4; Resident Incident Activity Summary, at 6; BPD Supplement Report, at 26.

[22]    *See* BPD Supplement Report, at 26.

[23]    *See id.*

[24]    *See* Resident Incident Activity Summary, at 6; BPD Supplement Report, at 27.

[25]    *See* Resident Incident Activity Summary, at 6–7.

[26]    *See id.* at 7.

[27]    *See* BPD Supplement Report, at 31.

[28]    *See* Gilbert Trauma Flow Sheet ("Plaintiff's Trauma Flow Sheet"), Exh. A to Plaintiff's Response [Doc. # 166], at 1; Deposition of Charles B. Williams, M.D. ("Williams Deposition"), Exh. A to Defendants' Motion [Doc. # 161], at 36.

doctor on staff at the time, took charge of Gilbert's evaluation and stabilization.[29]  At 10:30 p.m., Dr. John Mason, a general surgeon, was paged.  Dr. Mason arrived at Gilbert's room at 10:55 p.m.[30]  At 11:01 p.m., Gilbert again rated his level of pain as an "8" on a 1-to-10 scale.[31]  Shortly thereafter, Dr. Mason took over Gilbert's medical care from Dr. Williams.[32]  While Gilbert was in Dr. Williams' care, Dr. Williams neither proscribed nor administered pain medication to Gilbert.

Once Gilbert was in Dr. Mason's care, Dr. Mason ordered a CT scan to look for bullet fragments and to determine whether Gilbert had a punctured chest cavity.  At 11:05 p.m. Gilbert was moved to the CT scan area and scanned.[33]  At 11:25 p.m., Gilbert was taken from the CT scanning area back to his room, his bandages were changed, and ice packs were placed on his shoulders.[34]

When Gilbert and Reyes arrived at the Hospital, Detectives Anderson and Fry were sent to determine whether there was a third robber holding hostages inside the restaurant.[35]  At the time Anderson and Fry were sent to the hospital, none of the

---

[29]   Williams Deposition, at 32.

[30]   Plaintiff's Trauma Flow Sheet, at 1.

[31]   *See id.*

[32]   Affidavit of Charles Williams, M.D. ("Williams Affidavit"), Exh. B to Plaintiff's Response [Doc. # 166], at 2.

[33]   Plaintiff's Trauma Flow Sheet, at 3.

[34]   *Id.*

[35]   Deposition of Lori Anderson Berndt ("Anderson Deposition"), Exh. C to City Defendants' Motion [Doc. # 161], at 38; Deposition of Stephen Fry ("Fry Deposition"), Exh. D to City Defendants' Motion [Doc. # 161], at 41.

hostages had exited the building and the police had not yet entered.[36]  Anderson and Fry arrived at the Hospital slightly before 11:25 p.m.[37]

At 11:25 p.m., Nurse Tracy Shimek ("Shimek") made the following notation in Gilbert's trauma flow chart:

> MD aware of pt. c\o pain. Informed by MD to wait until police are done speaking to pt.  Det. Fry & Det. Anderson @ BS.[38]

Shimek testified that, without abbreviations, her entry stated:

> Medical doctor aware of patient complaint of pain.  Informed by medical doctor to wait until police are done speaking to patient.  Detective Fry and Detective Anderson at bedside.[39]

At approximately 11:30 p.m., Anderson began recording her first interview with Gilbert to confirm the number of robbers.[40]  Gilbert stated that there were just two robbers involved in the incident.[41]  Several times during this first interview Gilbert

---

[36]     *Id.*

[37]     *See* Plaintiff's Trauma Flow Sheet, at 3.  The Court notes that Anderson and Fry have given conflicting testimony regarding whether they arrived at the hospital together. *Compare* Anderson Deposition [Doc. # 161, Exh. C], at 42 ("I arrived at the hospital with Detective Fry.") *with* Fry Deposition [Doc. # 161, Exh. D], at 41 (testifying that he did not ride to the Hospital with Anderson).  However, this conflicting testimony does not impact the Court's analysis in any way.

[38]     Plaintiff's Trauma Flow Sheet, at 3.

[39]     Deposition of Tracy Shimek ("Shimek Deposition"), Exh. F to Plaintiff's Response [Doc. # 166], at 65.  Gilbert also testified that to the "best of his knowledge," Nurse Shimek told him that she could not give him pain medication until the police were done and the doctors okayed it. Deposition of Stephen Gilbert ("Gilbert Deposition"), Exh. E to City Defendants' Motion [Doc. # 161], at 91-92.

[40]     Anderson Deposition [Doc. # 161, Exh. C], at 42

[41]     Transcript of First Interview ("Transcript of First Interview"), Exh. H to Plaintiff's Response [Doc. # 166], at 1.

complained about his pain.[42]   During the interview, an unidentified doctor passing through the room stated that Dr. Mason is in charge.[43]   Later, during Anderson's first interview with Gilbert which concluded at approximately 11:35 p.m.,  a nurse says, "I told Doctor (UNCLEAR)[,] the ER Doctor[,] he is aware of your pain he does not want to give you pain medicine at this time."[44]  Lastly, an unidentified doctor informs Gilbert "No[,] you'll have some pain medicine ordered but they need you to be awake to answer their questions right now, okay."[45]  The parties vigorously dispute whether the reference to "they" and "their" refers to Anderson and Fry or the doctors and other hospital medical staff.

Dr. Mason stated that he did not prescribe Gilbert pain medication at the time of his initial examination because the extent of Gilbert's injuries was unknown and Dr. Mason could not determine if it was safe to administer narcotics at that time.[46]  By 11:45 p.m., however, Dr. Mason had completed his evaluation and determined that it was safe to administer pain medication.[47]  At 11:45 p.m., Dr. Mason ordered morphine sulfate ("morphine") for Gilbert as needed.[48]  Morphine can cause drowsiness and

---

[42]     *Id.* at 1–7, *passim*.

[43]     *Id.*, at 2.

[44]     *Id.* at 3.

[45]     *Id.* at 7.

[46]     Deposition of Dr. John A. Mason ("Mason Deposition"), Exh. B to Defendants' Motion [Doc. # 161], at 48.

[47]     *Id.* at 57.

[48]     *Id.*; Plaintiff's Trauma Flow Sheet, at 2.

diminished lucidity.[49]  Dr. Mason did not, however, specify when the morphine was to be administered nor direct that it be administered as soon as possible.[50]

Meanwhile, at approximately 11:35 p.m., Anderson left Gilbert's bedside to speak with Reyes, the victim who was also being treated at the hospital.  Reyes informed Anderson that there had only been two robbers.[51]  After speaking with Reyes, Anderson went to speak with another victim, Mr. Sanchez, who had recently arrived at the Hospital.[52]  At some point (not identified in the record), Mr. Sanchez said there were only two robbers involved.[53]  While Anderson was interviewing these victims, Fry began to interview Gilbert again at approximately 11:45 p.m.[54]  Anderson returned to the Gilbert interview after some unknown period of time.[55]  During the second interview, Anderson and Fry asked Gilbert direct questions about the number of suspects involved,[56] questions about other people Gilbert and Hall had associated with during the day, the gun that was used, the respective roles of Gilbert and Hall, and the number and disposition of the hostages.[57]   Gilbert complained of pain

---

[49]     *See* PHYSICIANS' DESK REFERENCE 1772-74 (63d ed.  2009); Affidavit of Dr. John A. Mason ("Mason Affidavit"), Exh. B to Plaintiff's Response [Doc. # 166], at 3.

[50]     Mason Deposition,. at 58.

[51]     Anderson Deposition, Exh. J to Gilbert's Response [Doc. # 166], at 73.

[52]     *Id.* at 74.

[53]     *Id.* at 75.

[54]     *Id.* at 75–76.

[55]     Transcript of Second Interview, at 13.

[56]     *See id.* at 2, 17.

[57]     *See id.* at 1–36.

periodically during the interview.[58]  At 12:01 a.m. (December 20, 2004), Gilbert again rated his level of pain at "8."[59]  During the interview, medical staff were attending to Gilbert's injuries and bandages, took pictures, and performed various tests.[60]

At 12:51 a.m., Anderson and Fry completed the interview and left Gilbert's room.[61]  At 12:58 a.m., morphine was administered by a nurse.[62]  At 1:00 a.m., Gilbert was not asked to rate his pain because he was "resting."[63]  Sometime after 1:30 a.m., Gilbert was taken for surgery to repair his shoulder wounds.  Gilbert remained in the Hospital for three days and then was released to police custody.

## II.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).  Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

---

[58]    *See id.*

[59]    Plaintiff's Trauma Flow Sheet, at 1.

[60]    *See* Transcript of Second Interview, *passim.*

[61]    *See id.* at 36.

[62]    Plaintiff's Trauma Flow Sheet, at 3.

[63]    *Id.* at 1.

movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The moving party, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Prod., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the non-moving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002). Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-

12

movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).   Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted).  In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).   "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *See id.* (internal citations and quotations omitted).

## III.   ANALYSIS

### A.   Claims against Anderson and Fry

Gilbert brings claims against Anderson and Fry under 42 U.S.C. § 1983 for depriving him of his constitutional right to medical care.   Gilbert alleges that Anderson and Fry conspired with St. Joseph Hospital personnel by instructing them to withhold pain medication in order to facilitate the interrogation.  To prevail on a § 1983 claim, "'a plaintiff must first show a violation of the Constitution or of federal law, and then show that the violation was committed by someone acting under color of state law.'" *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008) (quoting *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252–53 (5th Cir. 2005)).  Anderson and Fry both move for summary judgment on the ground that they are entitled to qualified immunity from suit.

### 1.    Qualified Immunity

The doctrine of qualified immunity shields government officials, acting within the scope of their authority, from civil liability for performing discretionary functions "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, __U.S. __, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   The doctrine of qualified immunity provides "'ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Kinney v. Weaver*, 367 F.3d 337, 349 (5th Cir. 2004) (en banc) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To determine whether a government official is entitled to qualified immunity for an alleged constitutional violation, reviewing courts typically conduct a two-prong analysis set forth in *Saucier v. Katz*, 533 U.S. 194 (2001), *overruled in part by Pearson*, __U.S. __, 129 S.Ct. at 817.   The first prong of the *Saucier* analysis asks whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the official's conduct violated a constitutional right.   *See Scott v. Harris*, 550 U.S. 372, 377 (2007) (citing *Saucier*, 533 U.S. at 201). "If, and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case.'" *Id.* (quoting *Saucier*, 533 U.S. at 201).   If there is evidence to support the violation of a constitutional right, the second prong of the *Saucier* analysis asks whether qualified immunity is appropriate, nevertheless, because the defendant's actions were objectively reasonable "in light of clearly established law at the time of the conduct in question." *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009) (quoting *Freeman v. Gore*, 483 F.3d 404, 410–11 (5th Cir. 2007)).

The Supreme Court has recently clarified that the two-prong protocol

established in *Saucier*, while often appropriate, is no longer mandatory for resolving all qualified immunity claims. *Pearson*, __U.S. __, 129 S. Ct. at 818. Reviewing courts are permitted "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* Thus, the "rigid *Saucier* [two-step] procedure" need not be followed. *Id.* In this case, however, the Court concludes that Gilbert's allegations concerning his medical care warrant examination under both prongs of the traditional *Saucier* inquiry.

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense. *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005). Once a defendant invokes entitlement to qualified immunity, plaintiff has the burden to demonstrate the inapplicability of the defense. *See Collier*, 569 F.3d at 217. The plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law. *See Michalik*, 422 F.3d at 262. Moreover, the plaintiff cannot rest on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the official's conduct. *Id.*

### 2.    An Arrestee's Constitutional Right to Medical Care

There is no dispute that Gilbert was in police custody while at the hospital, although he had not yet been placed under formal arrest. An arrestee's constitutional right to medical care is subject—as a practical matter—to the same standard that governs claims filed by pretrial detainees and convicted prisoners. *See Mace v. City of Palestine*, 333 F.3d 621, 625–26 (5th Cir. 2003).[64] Under this standard, "[l]iability

---

[64]    Claims brought by an arrestee are typically governed by the Fourth Amendment, which limits law enforcement officers to those actions that are "objectively
(continued...)

for failing to provide [medical] care attaches if the plaintiff can show that [an officer] acted with deliberate indifference to a substantial risk of serious medical harm and that injuries resulted." *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000) (citing *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc)).  To establish a constitutional violation under this standard, Gilbert must show that (1) Anderson and/or Fry exposed him to a substantial risk of serious bodily harm, and (2) Anderson and Fry acted or failed to act with deliberate indifference to that risk. *See Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Furthermore, "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

Anderson and Fry argue that Gilbert fails to meet his burden under the first

---

[64]  (...continued)

reasonable" under the circumstances. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that all claims of excessive force during an arrest are governed by the Fourth Amendment and its "reasonableness" inquiry, rather than under a "substantive due process" approach).  Pretrial detainees, who are protected by the procedural and substantive due process guarantees of the Fourteenth Amendment, may not be subjected to conditions or restrictions which amount to "punishment." *Bell v. Wolfish*, 441 U.S. 520, 536–37 (1979). The rights of convicted prisoners are governed by the Eighth Amendment, which prohibits cruel and unusual punishment in the form of "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see also Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (comparing the rights of pretrial detainees and convicted prisoners). The Fifth Circuit has recognized that there is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care. *See Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001) (citing *Hare*, 74 F.3d at 643). Accordingly, the same standard governs constitutional claims concerning medical care by pretrial detainees as convicted inmates. *See id.* At a minimum, the defendants had a duty not to be deliberately indifferent to Gilbert's serious medical needs. *See Cupit v. Jones*, 835 F.2d 82, 85 (5th Cir. 1987) (citing *Partridge v. Two Unknown Police Officers of Houston*, 791 F.2d 1182, 1187 (5th Cir. 1986)).

prong of the qualified immunity inquiry because he has not demonstrated that a violation of his constitutional rights occurred.  They argue that (a) Gilbert was not exposed to a substantial risk of serious harm, (b) they were not deliberately indifferent to any such risk and, finally, (c) Gilbert did not suffer substantial harm as the result of any delay in medical treatment.  The Court will first consider whether Gilbert was exposed to a substantial risk of serious harm while Anderson and Fry questioned him at the Hospital.

### a.    Exposure to a Substantial Risk of Serious Bodily Harm

Gilbert arrived at the hospital with a gunshot wound in each shoulder and a fractured right arm.  Defendants do not dispute that these are serious injuries.  It is also undisputed, however, that Gilbert received treatment for these wounds before, during and after Anderson and Fry questioned him at the Hospital.  Gilbert's claim of a constitutional violation is premised solely on the pain he suffered during an alleged delay in administration of pain medication.  Accordingly, when evaluating whether Gilbert was exposed to a substantial risk of serious bodily harm, the Court looks to the pain he suffered during the time of proven delay in his receipt of pain medication.

Defendants argue that the delay in administration of the pain medication after it was ordered by Dr. Mason did not expose Gilbert to a substantial risk of serious harm.  They contend that short or occasional delays in receiving pain medication do not give rise to a substantial risk of serious medical harm.  Defendants argue that this is particularly true in the situation at bar where Gilbert's condition improved while he was at the Hospital,[65] and where Gilbert's treating physicians testified without contradiction that delay, if any, in administering pain medication did not physically

---

[65]    Mason Deposition, at 71–72.  The Court notes, however, that  Gilbert's self-reported level of pain remained constant at "8" until he was administered pain medication at 12:58 a.m.

injure Gilbert or affect the ultimate outcome of his treatment.[66]   In other words, Defendants argue that the alleged delay did not give rise to a substantial risk of serious medical harm and there was no medical need for immediate administration of the morphine Gilbert sought.

"A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."   *Gobert*, 463 F.3d at 345 n.12 (citing *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th Cir. 1994)).   As noted, Gilbert arrived at the emergency room at approximately 10:30 p.m.   Anderson and Frye arrived slightly before 11:25 p.m.   Approximately 20 minutes later, Dr. Mason ordered pain medication at 11:45 p.m.; it was administered at 12:58 a.m., shortly after Anderson and Fry left Gilbert's bedside.   Gilbert has produced no evidence that Dr. Mason delayed ordering the pain medication for any non-medical reason.[67]   Accordingly, the delay of which Gilbert complains was at most one hour and thirteen minutes, the length of time elapsed between Dr. Mason's order and administration of the morphine.

Ordinarily, short delays in receiving pain medication, absent a distinct serious medical need, do not give rise to a substantial risk of serious medical harm.   *See Haddix v. Kerss*, 203 F. App'x 551, 553 (5th Cir. 2006) ("[Plaintiff] has not shown that he faced a 'substantial risk of serious harm' from the occasional denial of pain medication or delay in transferring him to a lower bunk.   The result of the defendants' actions was unrelieved, pre-existing, back and shoulder pain, not a worsening of his condition or other serious harm."); *King v. Kilgore*, 1996 WL 556845 (5th Cir. 1996)

---

[66]     *Id.* at 74; Williams Deposition, at 90.

[67]     Nor is there a viable argument on the factual record presented that the officers were responsible for any delay in Gilbert's medical treatment before the officers arrived at the Hospital.

(unpublished) (stating that delay in medical care causing pain and discomfort was insufficient to establish substantial harm); *Weddle v. Collins*, 1995 WL 295932, at *2 (5th Cir. 1995) (unpublished) (characterizing plaintiff's complaint that he should not have had to wait two months to receive pain medication as disagreement with medical treatment and, therefore, not actionable); *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992) (holding that when the defendant received continuous medical treatment but where "a dose of medication may have been forgotten," defendant had not established a substantial risk of serious harm because while "continuing back pain is unpleasant" it does not "in and of itself demonstrate that a constitutional violation occurred"); *see also Parker v. Doty*, 2009 WL 804098, at *2 (N.D. Tex. Mar. 25, 2009) ("While Plaintiff may have endured an increased level of back pain without his medication, the pain was temporary, lasting no more than a day, and as such, does not rise to the level of substantial harm."); *Neubert v. Medical Adm'r*, 2006 WL 3478732, at *5 (N.D. Tex.  Dec. 1, 2006) ("Although Plaintiff documents pain (exacerbated by his refusal to accept some of the pain medications), he provides no evidence of measurable, lasting, substantial harm for which "mere delay" in treatment would justify recompense."); *Williams v. Dallas County*, 2003 WL 21662823, at *3 (N.D. Tex. July 14, 2003) ("Although he did not receive pain medication and antifungal shampoo for more than two months after his initial request, there is no evidence that this delay was the result of deliberate indifference on the part of any defendant or caused substantial harm."); *Hill v. Bowles*, 2003 WL 21448045 (N.D. Tex. June 18, 2003) (holding that a prisoner who was not provided pain medication following the suturing of a head wound — but who received anesthetic at the time of the suturing — failed to demonstrate "a sufficiently serious medical need" to support his § 1983 claim).  *Compare Powell v. Easter*, 467 F.3d 459 (5th Cir. 2006) (prisoner with *documented heart condition* could recover for pain suffered during delay in treatment

because he was at a substantial risk of serious harm when he was experiencing *severe chest pains* and was denied nitroglycerin and sent back to his cell for four hours); *Thompkins v. Belt*, 828 F.2d 298, 301 (5th Cir. 1987) (affirming prisoner's award for pain and discomfort resulting from a *three and a half month delay* in proper *treatment* for a back injury).[68]

Gilbert does not demonstrate that the period between the doctor's order for pain medication and administration of that medication gave rise to a substantial risk of serious medical harm.  Gilbert has presented no evidence that there was a "delay" in medical or legal respects.  There is no evidence that a gap of 1-1/4 hours was unusual in St. Joseph Hospital's emergency room, *i.e.*, was longer than the typical time period the Hospital required to carry out medical orders for emergency room patients. Moreover, Dr. Mason testified without contradiction that there were several legitimate medical reasons why postponing administration of the pain medication for Gilbert may have been beneficial.  Specifically, Dr. Mason testified that "given the fact that it was clear Mr. Gilbert would undergo orthopedic surgery to repair his humerus, it is reasonable to delay the administration of narcotics to allow the surgical anesthesiologist a 'clean slate' to work with, as well as maintaining hemodynamic stability with surgery in mind."[69]  Dr. Mason also testified that Gilbert "underwent neurological and vascular evaluations at 0045 (12:45 a.m.) on April 20, 2004," and

---

[68]     Gilbert unpersuasively relies on one additional Fifth Circuit case, the unpublished decision in *Hanna v. Corr. Corp. of Am.*, 95 F. App'x 531, 533 (5th Cir. 2004).  In *Hanna*, the Court of Appeals reversed the district court's decision to dismiss a claim as frivolous under 28 U.S.C. § 1915(e)(2)(B)(I).  The claim involved denial of treatment for a toothache and denial of pain medication during the delay.  The court, ruling on a motion to dismiss and without the benefit of a factual record, devoted only one paragraph to this claim.  This decision is not probative authority for Gilbert's position in response to Defendants' summary judgment motion.

[69]     Mason Affidavit, at 3.

that "it is reasonable to delay the administration of morphine until these checks were complete due to the need for Mr. Gilbert's attention and participation to fully evaluate his injuries before surgery."[70]

Of further importance, Gilbert was under continuing medical care throughout the period in question.  The transcripts of the police interviews reveal that Anderson and Fry's questioning of Gilbert was repeatedly interrupted by hospital personnel providing treatment to Gilbert, and the officers did not impede medical personnel's access to Gilbert while they were questioning him.

Gilbert places significant importance on a nurse's notation in his medical records:  "Informed by medical doctor to wait until police are done speaking to patient.  Detective Fry and Detective Anderson at bedside."[71]  While this notation may be pertinent to whether the officers' questioning was a factor in the timing of the administration of the morphine, there were other legitimate reasons for the nurses to wait to administer the narcotic.

---

[70]   *Id.*

[71]   Deposition of Tracy Shimek, Exh. F to Plaintiff's Response [Doc. # 166], at 65.  The Court does not rely on for purposes of the City Defendants' Motion, but notes for the record, that Dr. Mason and Dr. Williams each deny that they ever told Nurse Shimek to delay pain medication until the police were done.  *See* Williams Deposition [Doc. # 161, Exh. A], at 21, 78, 86–88; Mason Deposition [Doc. # 159, Exh. B], at 26, 28–29, 53-55, 58.  Nurse Shimek testifies that she has no memory of the making the note, and that Anderson and Fry did not make any requests that she deny anything to Gilbert.  She also testified that she has never taken instruction from a police officer on how to treat a patient in her career.  Shimek Deposition [Doc. # 161, Exh. F], at 98–99.  Shimek further testified that she has never had a doctor tell her to delay care to a patient until after the patient had been questioned by law enforcement.  Shimek Deposition [Doc. # 162, Exh. B(2)], at 73.  Officers Anderson and Fry testified that they never instructed any medical personnel to delay pain medication to Gilbert.  Anderson Deposition [Doc. # 161, Exh. C], at 65–66, 102, 104–05; Fry Deposition [Doc. # 161, Exh. D], at 98, 100–02.

Furthermore, the chart notation does not bear on whether Gilbert had a substantial risk of serious medical harm, the threshold issue in determining whether there was in fact a constitutional violation. There is no evidence he was at risk of his medical condition worsening as a result of this delay. Even if pain *per se* for approximately an hour can, as a matter of law, give rise to a constitutional violation in certain cases, Gilbert's circumstances do not reach that level. Gilbert complained about pain periodically during the interview with Anderson and Fry (he rated his pain a level "8" at 12:01 a.m.), but the transcript of the taped interview establishes clearly that Gilbert's pain was not so severe that he was unable or unwilling to answer their questions. In fact, the interview transcript reveals that Gilbert willingly cooperated with the officers. He submitted to an "atomic absorption," a test administered to his fingers to determine if he recently fired a gun, and jokingly referred to the process as "CSI."[72] Gilbert felt well enough to complain that he was shot in the back while running away.[73] He chatted with the officers, discussing how long they had been on the police force and whether they thought he would be released on a bond so that he could spend Christmas with his children.[74]

The facts at bar thus are legally insufficient to demonstrate that Gilbert was at substantial risk of serious medical harm from any delay that may have occurred as a result of the officers' questioning. The Court accordingly concludes that Gilbert has not established a genuine fact question with evidence sufficient to support a jury verdict in his favor on the threshold issue for his constitutional claim of deliberate indifference to his medical needs, *i.e.*, that a delay of administration of medication

---

[72]     *See* Transcript of Second Interview, at 23-24.

[73]     *Id.* at 4.

[74]     *Id.* at 26-27.

created a substantial risk of serious medical harm.  Defendants Anderson and Fry, therefore, are entitled to qualified immunity on this claim.

### b.     Deliberate Indifference

Assuming *arguendo* that Gilbert could establish that he was exposed to a legally cognizable "substantial risk of serious harm," he nevertheless has failed to demonstrate a constitutional violation; he has not shown a genuine fact issue that Anderson or Fry had subjective knowledge of that risk of harm and disregarded it.  To establish deliberate indifference, Gilbert must show that Anderson and Fry (1) knew that Gilbert faced a substantial risk of serious bodily harm and (2) disregarded that risk by failing to take reasonable measures to abate it.  *See Gobert*, 463 F.3d at 346 (citing *Farmer*, 511 U.S. at 847).  "Deliberate indifference" requires that the official have *subjective* knowledge of the risk of harm, which "cannot be inferred from a . . . failure to act reasonably."  *Hare*, 74 F.3d at 649.  The Fifth Circuit has stated that the deliberate indifference standard is an "extremely high" one to meet.  *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  Indeed, "[d]eliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind."  *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997) (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)); *see also Stewart v. Murphy*, 174 F.3d 530 (5th Cir. 1990).  Mere negligence, or even gross negligence, is insufficient to establish subjective deliberate indifference.  *Hare*, 74 F.3d at 645.  Moreover, "[d]isagreement with medical treatment alone cannot support a claim under § 1983."  *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001); *see also Haddix v. Kerss*, 203 F. App'x 551, 553 (5th Cir. 2006).

Gilbert argues that Anderson and Fry were aware that medical personnel were waiting for them to finish their interview before administering pain medication, and that they nevertheless continued to interview him with deliberate indifference to his

serious medical needs.  Most significantly, Gilbert points to Anderson's testimony and the interview transcript indicating that she heard one of the doctors inform Gilbert that he would get pain medication but that he needed to be awake to answer "their questions."  There is no indication whose questions the doctor was referring to; the statement was made in the presence of multiple medical personnel who were examining and treating Gilbert.[75]  Indeed, Gilbert's interpretation of this ambiguous statement is belied by Anderson's testimony that she had "no idea" whether medical personnel were intentionally keeping Gilbert awake by withholding pain medication.[76] Anderson and Fry also testified that they did not ask any doctor or nurse at St. Joseph Hospital to withhold pain medication from Gilbert.[77]  Gilbert testified that he did not hear Anderson or Fry request any doctor or nurse to withhold pain medication.[78] Moreover, Gilbert has presented no evidence that during the relevant period Anderson and Fry were ever aware that Dr. Mason had ordered pain medication.  Gilbert has not shown that the officers knowingly failed to take reasonable measures to abate a risk of harm of which they were unaware.

Regarding whether Anderson and Fry were subjectively aware that their continued questioning of Gilbert was delaying the administration of pain medication, Gilbert also points to Fry's acknowledgment that a medic told him that the medics

---

[75]     Anderson Deposition [Doc. # 161, Exh. C], at 64-65.

[76]     *Id.* at 65.

[77]     Anderson Deposition [Doc. # 161, Exh. C], at 65–66, 102, 104–05; Fry Deposition [Doc. # 161, Exh. D], at 98, 100–02.

[78]     Gilbert Deposition [Doc. # 161, Exh. E], at 17.

were "just waiting on you, when you're done I'll be able to take him upstairs."[79]  The medic, however, did not mention pain medication.  There is no indication in the record that the medication could not be administered where Gilbert then was located.  Rather, the medic's comment reflects a need for monitoring.

Finally, Gilbert testified that Anderson informed him that he would not receive pain medication until he told her what happened at the Taqueria Arandas.[80]  This statement does not appear in the transcript of either interview with Gilbert but, in any event, this evidence does not constitute proof that Anderson communicated to the medical staff any order that they withhold pain medication.  Thus, this statement does not establish failure to take reasonable measures to abate a risk of which Anderson was aware.

The summary judgment evidence viewed in the light most favorable to Gilbert does not reveal that Anderson or Fry either instructed or requested that anyone at St. Joseph Hospital withhold pain medication from Gilbert.  Dr. Mason, Dr. Williams and Nurse Shimek testified without contradiction that they received no such instruction from any law enforcement personnel regarding Gilbert's treatment.[81]  Gilbert relies largely on speculation and his own subjective interpretation of ambiguous evidence.  As a result, at most, Gilbert's proof could be said to amount to a scintilla of evidence, which is not adequate to support a jury verdict in his favor.  *Freeman v. Tex. Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)) ("[T]he nonmovant cannot satisfy [his] burden [on

---

[79]     Fry Deposition [Doc. # 166, Exh. K], at 89-90.

[80]     *See* Gilbert Deposition [Doc. # 161, Exh. E], at 72.

[81]     Williams Deposition [Doc. # 161, Exh. A], at 21, 78, 86–87; Mason Deposition [Doc. # 161, Exh. B], at 28–29; Shimek Deposition [Doc. # 161, Exh. F], at 98–99.

summary judgment] with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.").

To the extent Gilbert's complaint of delay in administration of his pain medication is a disagreement with his medical treatment, this claim does not support relief under § 1983.  *Gibbs*, 245 F.3d at 549.  On this record, Gilbert has not raised a genuine fact issue that Anderson and Fry caused the "unnecessary and wanton infliction of pain repugnant to the conscience of mankind."  *Norton*, 122 F.3d at 291.

The Court concludes therefore that Gilbert has failed to establish a constitutional violation because he has not shown that Anderson and Fry were aware of any substantial risk of serious medical harm and disregarded that risk by knowingly failing to take reasonable measures to abate it.  Therefore, Defendants Anderson and Fry are entitled to qualified immunity on Gilbert's § 1983 claims on the deliberate indifference prong.[82]

### 3.    Objective Reasonableness

Because Gilbert has failed to establish a constitutional violation, the Court need not proceed to the final prong of the qualified immunity analysis, *i.e.*, an analysis of the officers' reasonableness and good faith under the circumstances.  *See Hathaway v. Bazany*, 507 F.3d 312, 320 (5th Cir. 2007).  In an exercise of caution and for the sake of completeness, however, the Court addresses the issue and concludes that Gilbert has not made a sufficient showing.

To avoid summary judgment on this issue, Gilbert, as the non-movant, has the burden to produce admissible evidence that raises a genuine issue of material fact on

---

[82]    Because Gilbert has failed to raise a genuine issue of material fact as to whether his constitutional rights were violated by any delay in the administration of pain medication, the Court does not reach the issue of whether he suffered substantial harm as a result of the delay.  In any event, for the reasons set forth in Section III(A)(2) above, Gilbert did not show that he suffered substantial harm.

whether the officer defendants' actions were objectively unreasonable under the circumstances in view of existing law and the facts known to them.  *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005).  "For immunity to apply, the 'actions of the officer must be objectively reasonable under the circumstances, such that a reasonably competent officer would not have known his actions violated then-existing clearly established law.'"  *Mesa v. Prejean*, 543 F.3d 264, 269 (5th Cir. 2009) (quoting *Evett v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 330 F.3d 681, 688 (5th Cir. 2003)).  In that regard, "[i]f officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact."  *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

As outlined above, Detectives Anderson and Fry arrived at the hospital shortly before 11:25 p.m.  At that time, officers at the scene were still uncertain about the number of robbers and hostages remaining inside the Taqueria Arandas restaurant. Given the severity and urgency of what the police legitimately believed was an ongoing, violent hostage situation, the decision to question Gilbert while he was receiving care at the hospital was not objectively unreasonable.  Importantly, this is not a case in which law enforcement withheld all treatment from an injured detainee. It bears repeating that Gilbert was receiving medical care for his injuries during the entire time that Anderson and Fry conducted their questioning.

Even if the Court were to assume that Anderson and Fry had some part in delaying Gilbert's access to pain medication from the time it was prescribed at 11:45 p.m. to the time it was administered at 12:58 a.m., there is no evidence that these Defendants acted wantonly or maliciously, or with any intent to coerce a statement

from Gilbert.[83]   The record reflects that their questions primarily concerned the number and identity of other possible suspects to determine the level of potential harm posed to the hostages as well as the other police officers who were still attempting to secure the volatile crime scene.   Significantly, police officers did not declare the restaurant clear and secure until 1:59 a.m. (an hour after Gilbert received his pain medication), signaling an end to their concern that additional suspects remained a viable threat to public safety and to the law enforcement personnel still at the scene of the armed robbery.   By that time, Gilbert had been taken to surgery.        Gilbert counters that Anderson and Fry continued to question him for more than an hour after both he and the two victims at the hospital, Reyes and Sanchez, told the officers that there were only two perpetrators involved in the robbery.   He contends that this raises a genuine issue of material fact as to whether the officer's conduct was objectively reasonable.   The Court is unpersuaded.   Both officers testified that suspects are not always truthful.   The officers explained also that, in their experience, a suspect may become more comfortable and forthright during continued questioning, and then

---

[83]     The transcript of the second interview conducted by Detectives Anderson and Fry, which terminated at approximately 12:51 a.m., shows that Gilbert agreed to answer the questions as he was receiving treatment and that, although he expressed some discomfort, he was not incapacitated by his pain and he did not refuse to answer any of their inquiries because of his condition.  Transcript of Second Interview, *passim*. A review of the transcript betrays no hint of hostility between Gilbert and the officers. At one point, Gilbert joked with Detective Fry, who commented that he had been asleep at home when notified of the robbery and called to the hospital, to which Gilbert replied: "Sorry to wake you man[.]"  *Id*. at 23.  At the close of the interview, both Anderson and Fry thanked Gilbert for his cooperation and stated that they hoped he would be "feeling better" soon.  *Id.* at 36.  Gilbert replied, wishing the officers a "pleasant night."  *Id.*

correct a previous lie.[84]  Although two victims also informed Anderson and Fry that they believed there were only two suspects, given the violent hostage situation with an indeterminate number of perpetrators and hostages, it is reasonable for the officers to continue investigating the matter.  Tellingly, the police did not enter the building until 1:24 a.m. and the building was not declared clear and secure until 1:59 a.m. Given the facts at bar, the Court is unwilling to second guess Anderson and Fry's efforts to make certain that the building was clear before officers entered.  *Cf. Graham v. Connor,* 490 U.S. 386, 396-97 (1989) (the reasonableness inquiry "must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation").

Gilbert's contention that pain medication was wrongfully withheld from 11:45 p.m. until 12:58 a.m. does not raise a genuine issue of material fact on whether the actions by Detectives Anderson and Fry were unreasonable under the circumstances. The proof of record is not sufficient to overcome the officers' assertion of qualified immunity.  The Court grants Defendants Anderson and Fry summary judgment on qualified immunity.

**B.**     **Claims Against the City of Bryan**

Because Gilbert has failed to raise a genuine issue of material fact as to whether his constitutional rights were violated by City of Bryan personnel (Anderson and Fry), the City is also entitled to summary judgment.  Gilbert alleges that the City of Bryan[85]

---

[84]    *See* Anderson Deposition [Doc. # 161, Exh. A], at 56; Fry Deposition [Doc. # 161, Exh. D], at 70, 74.

[85]    Gilbert originally brought claims against Chief of Police Bobby Whitmire—as policymaker for the City of Bryan—for failing to train Anderson and Fry in the proper

(continued...)

failed to adequately train and supervise Detectives Anderson and Fry.[86]  Gilbert does not allege that the City operated pursuant to a custom of denying constitutional guarantees to criminal suspects.[87]  Rather Gilbert alleges only that the City's failure to adequately train or supervise Anderson and Fry resulted in their deprivation of medical care to him.

It is well settled that "inadequacy of police training may serve as the basis for § 1983 liability [against a municipality] . . . where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) *(*citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)); *Goodman v. Harris County*, 571 F.3d 388, 396 (5th Cir. 2009); *Pineda v. City of Houston*, 291 F.3d 325, 331 (5th Cir. 2002); *Conner v. Travis County*, 209 F.3d 794, 796-97 (5th Cir. 2000).  To establish the City's liability for "failure to train" and "failure to supervise," Gilbert must demonstrate that (1) Anderson and Fry's supervisor failed to train or supervise them; (2) there is a causal connection between the alleged failure to train or supervise and the alleged violation of Gilbert's rights; and (3) the failure to train or supervise constituted deliberate indifference to Gilbert's constitutional rights, tantamount to a "policy" of the municipality.  *See, e.g.*, *Brumfield v. Hollins*, 551 F.3d 322, 332 (5th

---

85      (...continued)
        treatment of a detainee with serious medical needs.  Gilbert brought his claim against
        Whitmire in his official capacity; however, "[a]ctions for damages against a party in
        his official capacity are, in essence, actions against the governmental entity of which
        the officer is named.  *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980).
        Therefore, by Memorandum and Order [Doc. # 118] on June 19, 2008, the Court held
        that the City of Bryan should be substituted for Whitmire.

86      Plaintiff's Second Amended Complaint [Doc. # 142], ¶¶ 39–42.

87      Gilbert's Response [Doc. # 166], at 14 n.1.

Cir. 2008); *Pineda*, 291 F.3d at 331-32; *see also Canton*, 489 U.S. at 389, 388-90 ("Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983"). To impose liability on a municipality under § 1983, there must be shown a "deliberate choice to follow a course of action" from "among various alternatives by city policymakers." *Goodman*, 571 F.3d at 396 (citing *Canton*, 489 U.S. at 389).

Gilbert's failure to train claim against the City is factually grounded on the alleged delay in administration of pain medication at St. Joseph Hospital while Anderson and Fry conducted their interview, the same grounds as his deliberate indifference claim against the officers themselves. Accordingly, the claim against the City fails on the same grounds as did the claim against Anderson and Fry. Gilbert has not demonstrated that the City's employees violated his constitutional rights, and therefore he cannot demonstrate a causal connection between a failure to train or supervise and any constitutional violation. The Court concludes that the City's Motion should be granted with respect to Gilbert's claims against the City.

The Court notes, however, that even if Gilbert were able demonstrate a constitutional violation, the City nevertheless would be entitled to summary judgment. Assuming without deciding that Gilbert could satisfy the first element of his claim by showing that the City lacked a specific policy governing the treatment of suspects who have not yet been arrested but who are being questioned by police and who may require medical attention, he fails to meet his summary judgment burden with respect to the causal connection element. Gilbert merely argues in conclusory fashion that "[a]s a result, Anderson and Fry conspired with Drs. Mason and Williams and St.

Joseph personnel to unconstitutionally withhold pain medication from Gilbert."[88]  This conclusory allegation does not meet Gilbert's summary judgment burden to demonstrate a genuine issue of material fact for trial.  *See Delta & Pine Land*, 530 F.3d at 399.  In the absence of proof the Court will not assume that Gilbert could or would prove the necessary facts to establish a causal connection between the lack of training and supervision, if any, and the delay in receiving the pain medication.  *See Little*, 37 F.3d at 1075.  Accordingly, Gilbert cannot establish the second element of his claim against the City.

Moreover, Gilbert has not met his burden to demonstrate that the alleged failure to train or supervise constituted "deliberate indifference."  Gilbert makes the conclusory assertion that the City was subjectively aware of its responsibility to train officers to follow the guidelines in the Operations Manual, that it failed to do so with respect to Anderson and Fry; and that participation in the deprivation of medical care is a violation of the City's policies.[89]  Gilbert's allegations do not establish that the City inferred that a substantial risk of harm existed as a result of the failure to train Anderson and Fry (or other officers) regarding timing of medical treatment during investigations.  Deliberate indifference is more than mere negligence; Gilbert must show that "in light of the duties assigned to [Anderson and Fry], the need for more or different training was obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Conner*, 209 F.3d at 796–97 (quoting *City of Canton*, 489 U.S. at 390).  There is no such proof in this record.  The City would be entitled to summary judgment on Gilbert's § 1983 claims even if he had

---

[88]     *Id.* at 17.

[89]     *Id.*

demonstrated a constitutional violation.

### C.    Claims Against Dr. Mason, Dr. Williams, and St. Joseph Hospital

Gilbert's failure to raise a genuine issue of material fact as to whether his constitutional rights were violated by the alleged delay in administration of pain medicine is also fatal to his claims against the various health care providers.  Gilbert alleges that Dr. Mason, Dr. Williams, and St. Joseph Hospital acting though its employee nurses conspired with Detectives Anderson and Fry to deprive him of his constitutional right to medical care.  To prevail on his § 1983 claims, Gilbert must first show the existence of a violation of his constitutional rights, and then show that the violation was committed by someone acting under color of state law.  *E.g.*, *Brown*, 519 F.3d at 236.  As set forth above, liability for failing to provide or delaying medical care attaches if the plaintiff can show that a state official acted with deliberate indifference to a substantial risk of serious medical harm and that injuries resulted. "Mere negligence will not suffice." *Id.* (citing *Hare*, 74 F.3d at 647-48). *Wagner*, 227 F.3d at 324.  To establish a constitutional violation under this standard, Gilbert must show that (1) he was exposed to a substantial risk of serious bodily harm, and (2) Dr. Mason, Dr. Williams, and St. Joseph Hospital acted or failed to act with deliberate indifference to that risk.  *See, e.g., Gobert*, 463 F.3d at 346.

Gilbert's claims against Dr. Mason, Dr. Williams, and St. Joseph Hospital arise from the same alleged delay in administration of pain medication that gives rise to his claims against Anderson, Fry, and the City.  First, Gilbert's claims fail because he has not demonstrated that any delay in the administration of pain medicine exposed him to a substantial risk of serious harm.  *See* discussion *supra* at pages 17-23.  Thus, Gilbert cannot show that his constitutional rights were violated and Dr. Mason, Dr. Williams, and St. Joseph Hospital are entitled to summary judgment on his § 1983 claims.

Assuming *arguendo* that Gilbert could establish a constitutional violation, he nevertheless has failed to meet his summary judgment burden because he has not demonstrated that Dr. Mason, Dr. Williams, or St. Joseph Hospital acted under the color of state law when they treated him.  "Private individuals generally are not considered to act under color of law, *i.e.*, are not considered state actors" for purposes of a § 1983 claim.  *See Ballard v. Wall*, 413 F.3d 510, 518 (5th Cir. 2005) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941(1982)).  However, a private party may be liable under § 1983 if the private citizen was a "'willing participant in joint activity with the State or its agents.'"  *Priester v. Lowndes County*, 354 F.3d 414, 420 (5th Cir. 2004) (quoting *Cinel v. Connick*, 15 F.3d 1338, 1342 (5th Cir. 1994); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150-52 (1970)).  To succeed on a joint participation or conspiracy theory, the plaintiff must allege not only a deprivation of constitutional rights, but also "an agreement between the public and private defendants to commit an illegal act."  *Priester*, 354 F.3d at 420.  Conclusory statements without reference to specific facts will not support a conspiracy allegation.  *Id.* at 420, 423 & n.9 (citing *Brinkmann v. Johnson*, 793 F.2d 111, 113 (5th Cir. 1986)); *see also Ballard*, 413 F.3d at 518-519 (absent specific facts that the private defendants knowingly participated in a conspiracy with state officials, the plaintiff fails to state a claim for conspiracy).

As *Priester* illustrates, the Fifth Circuit has set a high threshold for establishing a *prima facie* case of conspiracy in the § 1983 setting.  That case arose from a racially motivated attack by a high school football player, Ward, on an African American teammate, Priester, during football practice.  *Id.* at 417.  Prior to the attack, the coach himself had subjected Priester to racial epithets and negative comments concerning his weight, and was aware that Ward and at least one other player were verbally and physically abusive to Priester in the same fashion.  *Id.*  On the day of the attack,

Priester bested Ward during a practice drill. The coach then took Ward aside to "get on him" about the play. *Id.* Ward stared at Priester throughout the conversation with the coach, and immediately afterwards stated that he "had something for him." *Id.* On the next play, Ward thrust his hands through Priester's helmet and seriously injured his eye. *Id.*

Priester claimed a conspiracy between the coach and Ward to injure him and brought § 1983 claims alleging both that Ward was liable as a willful participant in joint activity with the school and that school officials were liable since Ward's conduct was fairly attributable to them. *Id.* The court of appeals held that Priester failed to state a claim against Ward because allegations in his complaint that the coach either "ignored or encouraged/or allowed" the assailant's behavior were not sufficient to allege either an agreement between Ward and the coach to commit an illegal act or specific facts showing such an agreement. *Id.* at 420. Similarly, the court affirmed the grant of summary judgment on Priester's claim that Ward's actions should be attributed to the state because of the alleged conspiracy and the school's history of unpunished racial bullying. *Id.* at 423. The court stated that the record contained no evidence of the content of the conversation between Ward and the coach, and that there was no other evidence of an actual agreement. *Id.* Given this deficiency, the pleading and proof requirements for a *prima facie* case of conspiracy were not met and the evidence was insufficient to defeat summary judgment.[90] The Court applies

---

[90]     Although the court of appeals' discussion of a *prima facie* case of conspiracy came during its holding on Priester's claim that Ward's conduct should be attributed to the state rather than his claim that Ward should be liable as a state actor, both types of claims involve proving an agreement between private and public actors to engage in a joint activity. Further, for the proposition that Priester had not met the conspiracy proof requirements, the court relied on cases in which the plaintiff sought to hold a private person liable as a state actor, as Gilbert does here. *See Priester*, 354 F.3d at
(continued...)

the *Priester* standard to the evidence at bar.

### 1. Claim That Dr. Mason Was a State Actor

Gilbert first claims that Dr. Mason conspired with police to withhold pain medication in violation of Gilbert's constitutional rights. Gilbert relies on five pieces of evidence in support of his conspiracy allegation. First, Dr. Mason took over Gilbert's care from Dr. Williams shortly after 11:00 pm and thus was vested with authority to prescribe and administer pain medication throughout the time Anderson and Fry questioned Gilbert. Second, a doctor informed Gilbert, during the officers' questioning, that Mason was in charge of Gilbert's pain medication situation.[91]   At 11:25 p.m., Nurse Shimek made her notation upon which Gilbert places so much reliance: "Medical doctor aware of patient complaint of pain. Informed by medical doctor to wait until police are done speaking to patient. Detective Fry and Detective Anderson at bedside."   Gilbert argues that this order presumably was given by a doctor with authority over his pain medication. Third, Gilbert again references the statement from a doctor that although pain medication would be ordered, Gilbert needed to "be awake to answer *their* questions right now." (Emphasis added.) Fourth, seventy-three minutes elapsed between the time Dr. Mason ordered the pain medication and Gilbert received it. Gilbert contends that at the time Dr. Mason ordered the medication, he believed that any medical justification for the delay had passed. Finally, Gilbert received pain medication just seven minutes after the police ceased their interview. From this evidence, Gilbert argues, a reasonable juror could infer that Dr. Mason conspired with the police to delay pain medication in order to

[90]       (...continued)
423 & n.9 (citing *Brinkman*, 793 F.2d 111, 113) (citing *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982)).

[91]       Transcript of First Interview, at 2.

facilitate the officers' questioning of Gilbert.

The Court is unpersuaded.  Initially, Gilbert has presented no direct evidence that Dr. Mason, or any other doctor or nurse, ever discussed with any law enforcement officer withholding pain medication from Gilbert.  Indeed, the testimony by all those present is that no such instruction or directive was given.  Gilbert testified that he did not hear Anderson or Fry make any such request of a doctor or nurse.  Anderson and Fry denied doing so.  Dr. Mason and Dr. Williams both testified that they received no instruction or request from any law enforcement personnel to withhold pain medication from Gilbert.  In fact, Dr. Mason testified that his only interaction with Anderson and Fry was to interrupt them so he could treat Gilbert.[92]  Nurse Shimek testified that she has no recollection of conversing with doctors about Gilbert's treatment, and no doctor ever told her to delay care to a patient until after the patient had been questioned by law enforcement.[93]

Second, taken in the light most favorable to Gilbert, the nonmovant, the information of record at most circumstantially suggests Dr. Mason was the doctor whose order Nurse Shimek recorded on her 11:25 p.m. chart notation and that he was the one who informed Gilbert that he could not have pain medication right away because "they" needed him awake to answer "their" questions.[94]  The evidence at best raises a fact issue only about whether Dr. Mason ordered a delay of pain medication.

[92]    Mason Deposition [Doc. # 159, Exh. E], at 54-55.

[93]    Shimek Deposition [Doc. # 161, Exh. F], at 98–99; Shimek Deposition [Doc. # 162, Exh. B(2)], at 73.  Gilbert's testimony that Anderson told him he would not receive pain medication until he told her what happened at the Taqueria Arandas, *see* Gilbert Deposition [Doc. # 161, Exh. E], at 72, is not sufficient.  There is no evidence that Anderson in fact ever communicated this position to a doctor.

[94]    The Court reiterates that it is unclear whether this doctor was referring to medical personnel or law enforcement personnel.

Under *Priester*, however, such proof is insufficient to make out a *prima facie* case of conspiracy between Dr. Mason and the officers such that Dr. Mason could be a "state actor."  Gilbert has produced only conclusory allegations and his own speculation that there was any actual agreement between law enforcement officials and Dr. Mason to improperly delay medication.  This is not sufficient to demonstrate an agreement to commit an illegal act.  Further, as noted, the summary judgment evidence does not show that Anderson and Fry were even aware that pain medication was being withheld in order to facilitate their questioning of Gilbert.  Gilbert has not shown a fact issue that an unlawful conspiracy between Dr. Mason and the police officers existed to delay for investigative purposes Gilbert's receipt of morphine as pain medication.

### 2.     Claim That  Dr. Williams Was a State Actor

There is even less evidence to support Gilbert's allegation that Dr. Williams knowingly entered into a conspiracy with law enforcement officials to deny Gilbert pain medication.  It is not disputed that Dr. Williams was the emergency room doctor and transferred primary care of Gilbert to Dr. Mason at approximately 11:00 p.m.  In addition to reliance on the evidence against Dr. Mason, Gilbert points to two excerpts from the transcript of the officers' interviews that he claims implicate Dr. Williams in a conspiracy to violate Gilbert's constitutional rights.  First, Gilbert cites the statement by a nurse to Gilbert during the officers' first interview that the "ER" doctor was aware of his complaints of pain but did not want to provide pain medication at that time.  Second, Gilbert points to the statement by an unknown doctor that "they" needed him to be awake to answer "their" questions.  Gilbert argues that the above, along with Dr. Williams' testimony that he remained in the emergency room all night,

and could have been in and out of Gilbert's room multiple times,[95] provides substantial evidence that Dr. Williams conspired with the officers to withhold pain medication.

The evidence against Dr. Williams is insufficient as a matter of law to overcome Gilbert's summary judgment burden. As with Dr. Mason, there is no direct evidence that Dr. Williams withheld pain medication at the behest of Anderson or Fry or any law enforcement official.  Both Dr. Williams and the officers expressly deny any such interaction between any law enforcement and medical personnel.  Further, as Gilbert concedes, Dr. Williams had transferred primary care to Dr. Mason by the time the Defendant officers arrived at the Hospital.  Although the nurse's statement that the "ER" doctor did not want to "give [Gilbert] pain medication at this time" might implicate Dr. Williams, there is nothing in the record to indicate when the nurse actually spoke to the doctor, and thus no evidence that any directive to withhold morphine was made after the officers' arrival.  Nor is there any evidence that the doctor's decision to not give pain medication "at that time" had any non-medical basis, let alone anything to do with facilitating police questioning.  Indeed, the record shows that Gilbert was undergoing various tests prior to 11:25 p.m., the approximate time of the officers arrival at the Hospital.  Both Dr. Mason and Dr. Williams offered uncontradicted testimony that there were good medical reasons to delay the administration of pain medication until at least that time, and later.  Gilbert's allegations are merely conclusory speculation that Dr. Williams entered into a conspiracy with the officers to withhold pain medication from Gilbert.  These assertions are insufficient as a matter of law to raise a genuine issue of material fact

---

[95]     Williams Deposition [Doc. # 164, Exh. D], at 67.

on that issue.[96]

### 3.      Claim That  St. Joseph's Hospital Was a State Actor

Gilbert has also failed to raise a genuine issue of material fact as to whether St. Joseph Hospital entered into a conspiracy with law enforcement officials to delay the administration of pain medication.  As a preliminary matter, St. Joseph asserts, and Gilbert does not deny, that only the conduct of its employee nurses is at issue here because the doctors are not Hospital employees.  Rather, the doctors are independent contractors as members of the medical staff.

Gilbert's claim against St. Joseph rests primarily on the seventy-three minutes he waited for pain medication after Dr. Mason ordered it, and on Nurse Shimek's chart note ("Medical doctor aware of patient complaint of pain.  Informed by medical doctor to wait until police are done speaking to patient.  Detective Fry and Detective Anderson at bedside.").  Gilbert also testified, that to the "best of his knowledge," Nurse Shimek told him that she could not give him pain medication until the police were done and the doctors okayed it.[97]

The record shows that, at St. Joseph Hospital, doctors were responsible for ordering pain medication and nurses were charged with administering it.  At most, Gilbert's evidence indicates that Nurse Shimek, and perhaps other attending nurses, delayed administering pain medication under the orders of one or more unnamed *doctors*.  There is no non-speculative, conclusory evidence that any nurse agreed with

---

[96]     Having decided that Dr. Mason and Dr. Williams are entitled to summary judgment on the merits, the Court does not reach Dr. Mason's statute of limitations defense, which was adopted by Dr. Williams.  *See* Mason's Motion for Summary Judgment [Doc. # 159], at 38-40; Williams' Motion for Summary Judgment [Doc. # 130], at 1.

[97]     Gilbert Deposition [Doc. # 162, Exh. B], at 91-92.  This testimony essentially parrots the nurse's note discussed above.

law enforcement officials to delay pain medication, or that the nurses' treatment of Gilbert was directed by such officials in any way.  Nor is there evidence that there was any delay beyond what the Hospital's emergency room patients typically experienced.

In sum, Gilbert has failed to raise a genuine issue of material fact that either Dr. Mason, Dr. Williams, or St. Joseph's Hospital knowingly entered into a conspiracy with law enforcement officials to delay the administration of pain medication in order to facilitate Anderson and Fry's interview.  As such, all three defendants are entitled to summary judgment on Gilbert § 1983 claims even if he had demonstrated a violation of his constitutional rights because they were not acting under color of state law when they treated him.

## IV.  **CONCLUSION**

For the foregoing reasons, the Court grants summary judgment on Gilbert's claims against Anderson and Fry.  The Court also grants summary judgment on Gilbert's claims against the City, Dr. Mason, Dr. Williams, and St. Joseph Hospital. Accordingly, it is hereby

**ORDERED** that the City Defendants' Motion for Summary Judgment [Doc. # 161] is **GRANTED.**   It is further

**ORDERED** that Dr. Mason's Motion for Summary Judgment [Doc. # 159] is **GRANTED.**  It is further

**ORDERED** that Dr. Williams's Motion for Summary Judgment [Doc. # 163] is **GRANTED.**  It is further

**ORDERED** that St. Joseph Hospital's Motion for Summary Judgment [Doc. # 162] is **GRANTED.**  It is further

**ORDERED** that Gilbert's Motion to Exclude Expert Testimony [Doc. # 160] is **DENIED.**  It is further

**ORDERED** that the City Defendants' Motion to Stay Trial Setting Pending Determination of Motion for Summary Judgment is **DENIED.**

**SIGNED** at Houston, Texas, this <u>19</u>th day of **October, 2009**.

Nancy F. Atlas
United States District Judge